## *DENTON and others *against* JACKSON and others.

The undivided lands, or *plains, marshes* and *beaches,* situate in the town of *Hempstead,* and included in the tract of land granted, in 1644, by the *Dutch* governor *Kieft,* and, afterwards, in 1685, by the *English* governor *Dongan,* belonged to the *town,* in its collective or *corporate* capacity, as *common* property, and not to *individuals,* or to the heir of the surviving patentee, or those deriving title from the patentees or associates; and those lands remained common undivided property, belonging to the freeholders and inhabitants of *Hempstead,* at the time the town was divided, in 1784, into *North* and *South Hempstead.*

Whether the freeholders and inhabitants of *North Hempstead,* in their new corporate capacity, are entitled to any share in those *plains,* &c. *Quære?*

Private individuals, freeholders, and inhabitants of that town, cannot file a bill in behalf of themselves, and all others who may come in and contribute to the expense of the suit, or in behalf of the town, to try or establish the rights of the town, in regard to its common property.

THIS suit was brought to determine a controversy relative to certain *plains, marshes,* and a *beach,* situate in the town of *Hempstead,* in the county of *Queens,* before the division of that town into two towns, by the names of *North Hempstead* and *South Hempstead,* and which were, after that division, situate in *South Hempstead,* now called *Hempstead.*

The plaintiffs are freeholders and inhabitants of *North Hempstead,* prosecuting for themselves and all others similarly circumstanced, as to their freehold estate, or who have equal or similar rights with the plaintiffs, in the *plains, marshes,* and *beach* in question, and who should come in and contribute to the expenses of the suit.

The defendants belonged to the town of *Hempstead,* and the bill supposed that some of the defendants, *Bedell, Baldwin,* and *Lott,* had similar rights to those of the plaintiffs; that *Allen* and *Whaley,* two of the defendants, are freeholders and inhabitants of *Hempstead,* but do not claim similar rights; and the other defendants are inhabitants merely of the town of *Hempstead,* and vote at the town meetings.

*The plaintiffs alleged that the *plains,* &c. belonged to all persons who derive title under the patentees of the original town of *Hempstead,* their associates, heirs and assigns, as *tenants in common,* whether inhabitants of either of the present towns, *Hempstead* and *North Hempstead,* or of any other place, and that the legal title is in *Jacob S. Jackson,* their trustee.

The defendants, except *Jackson,* against whom the bill was taken *pro confesso,* insisted that the premises in question are *town commons,* formerly belonging to the town of

*January* 21st.

[ * 321 ]

251

1817.

DENTON
v.
JACKSON.

*Hempstead*, before its division into two towns, and since that division, to the town of *South Hempstead*, now known and called by the name of *Hempstead*, in exclusion of every other town and person.

As all the material facts of the case are noticed in the opinion of the Court, it is unnecessary to state the pleadings or proofs. The bill prayed that the rights of the plaintiffs, and of all other persons, either as a town or towns, or as individuals, might be declared and established, and the necessary conveyances or releases be made, to enable those who have right, to enjoy the same according to such right, in exclusion of all others; and that they may be enabled to make partition among themselves, or that the Court would make partition, according to justice and equity.

*October* 7th,
8th, 9th, 10th,
1816.

The cause was argued by *Harison, Riggs,* and *T. A. Emmet,* for the plaintiffs ; and by *Hoffman, S. Jones, jun.,* and *Wells,* for the defendants.

The following points were raised on the part of the plaintiffs : 1. The patent from Governor *Kieft,* under the authority of the *Dutch* government, vested no legal title to these lands in any person.

2. Admitting even that the *Dutch* patent did confer a legal title, that title was actually, or virtually, surrendered, by applying for, and accepting, the patent from Governor *Dongan;* more especially, as the latter patent gave new boundaries, reserved portions of the land, and a quit rent.

[ * 322 ]

3. The patent under Governor *Dongan* vested the lands therein described, or at least all the undivided lands, marshes, &c., comprehending the premises in question, in the persons therein named, in fee, as joint tenants, in, trust, for the benefit of themselves and their associates, the freeholders and inhabitants of the town, their heirs, successors, and assigns.

4. That the legal estate in the premises survived to *John Jackson,* the longest liver of the patentees, and descended from him to *Jacob S. Jackson,* his heir at law, and who is a trustee for the heirs and assigns of the said patentee, and their associates, according to the extent of their rights.

5. The words in the patent, "their associates, the freeholders and inhabitants of the said town of *Hempstead,* their heirs, successors and assigns," are limited to those persons who contributed to the expense of obtaining the patent, as appears by the votes of town meetings on that subject, and the deed executed to *John Jackson,* the surviving patentee ; and that, consequently, those persons only are beneficially interested in the premises in question who have a title, by de-

scent or purchase, from those who purchased and paid for the *English* patent.

6. The interest in the lands, &c. vested in the patentees and their associates, their heirs and assigns, as *distinct* from their other freehold estates.

7. If the premises in question did not exclusively belong to the patentees, and those who paid for the *English* patent, the same belonged to the freeholders of the town of *Hempstead*, exclusively, their heirs and assigns.

8. The division of the town of *Hempstead* did not devest the rights of individuals, under the patent, but they remain as before.

*9. The plaintiffs, being men of *North Hempstead*, are entitled to maintain the suit for themselves and all others of that town, having an interest in the premises; and the defendants, being partly heirs and assigns of patentees and associates, and partly freeholders, some of whom are not vested with the patent rights, and some inhabitants merely of the present town of *Hempstead*, are competent to defend the suit, and a decree will bind all persons of both towns.

10. The rights being established, it is competent to the Court to decree a *partition*, and to refer it to a *master*, to ascertain the persons interested, and the proportions of each, and the quantity of the premises in question to be divided, and to award a commission to have the partition made accordingly.

11. If the partition ought not to be made, or should be found impracticable, it will be competent to the Court to establish the right, and to guard against intrusions, or interruptions of it, by all others.

12. If there be any right in the plaintiffs and those for whose benefit the suit is brought, the same is cognizable in this Court, on account of the *trust*, and because of the great number of persons interested, and the remedy at law being defective and difficult.

The defendants stated the following points:

1. That the plaintiffs have no *equity* to entitle them to a decree against the defendants.

2. That the bill ought to be dismissed, for want of proper parties.

3. That there is no such *exclusive* right or title in the premises in question as is set up by the plaintiffs.

4. That the premises are *common and undivided* lands of the town of *Hempstead* exclusively, and the freeholders and inhabitants of the town are entitled to the free and common use thereof, subject to the regulations of the freeholders and inhabitants, in town meeting assembled.

1817.

DENTON
v.
JACKSON.

[ * 323 ]

1817.

DENTON
v.
JACKSON.
January 21st.

The Dutch patent for the town of Hempstead, in 1644, conferred a qualified corporate capacity on the inhabitants.

*The cause stood over for consideration to this day, when the following opinion was delivered by

THE CHANCELLOR. 1. The first and principal question is, whether the lands, of which partition is sought by the bill, be individual property, belonging either to the heir of the surviving patentee, or to those who derive title from the patentees and their specified associates, or whether it be common property of the town of *Hempstead,* and subject to its exclusive disposal.

To determine this question, we must recur to the original grants, and to the construction which they have received. The town of *Hempstead* was settled in 1644, under a patent from *William Kieft,* the then governor of the *Dutch* province. That patent granted the tract of land forming the town, to six persons, by name, with their *associates, their heirs and successors,* to *build a town,* and *fortifications,* and a house of worship, and to *erect a body politic or civil combination* among themselves, and to *nominate magistrates,* who were to hold Courts, civil and criminal, and with the consent of their *associates or free inhabitants,* to establish ordinances, &c.

I should conclude that such a grant as this, proceeding from the *English* government, would have given a qualified corporate capacity to the inhabitants of *Hempstead,* sufficient to enable them to take, manage and dispose of the land, as a civil community or body corporate. And under the civil law, which is the common law of the *Dutch,* corporations, with all the usual attributes, were well known and in familiar use, and created with less ceremony and difficulty than even with us.

The grant was to the association and their *successors,* as well as heirs, for public purposes of a municipal nature. The professed objects of the grant were consistent with the design of bodies politic. There is no particular *form of words requisite to create a corporation. A grant of a rent to a chaplain and his successors, and a grant to a body of men to hold mercantile meetings, (*Gildam mercatoriam,*) has been held to confer a corporate capacity. (10 *Co.* 27, 28. 30.) There are many instances of grants to the inhabitants of a town, that they should be a free borough, and enjoy various privileges which have been considered as making them a corporate body. (1 *Kid on Corp.* 52. 62, 63.)

[ * 325 ]

Persons may have *corporate* powers, for certain specified purposes only.

So persons may have corporate powers, *sub modo,* and, for certain specified purposes only. Our laws afford numerous examples of this kind. The loan officers of a county, and the supervisors of a county, are corporate bodies; and it was

254

observed by the Supreme Court, in *Jackson* v. *Hartwell*, (8 *Johns. Rep.* 422.) " that there were many instances in the law of collective bodies of men, coming under one general description, endowed with a corporate capacity in some particulars expressed, but who have, in no other respect, the capacities incident to a corporation."

The several towns in this state may be considered as legal communities, or bodies politic, for certain purposes. They are authorized, at their town meetings, to make rules and regulations for the better improving of " their common lands in tillage, pasturage, or any other reasonable way," and for making and maintaining pounds, and for imposing penalties, and to raise money for prosecuting or defending the common rights of the town; and all such rules or by-laws are to be recorded by the town clerk. The common lands of the town must mean such as belong to the town, in its aggregate or corporate capacity, for the town could have no right to interfere with the tillage or improvement of private individual property.

There was nothing, therefore, unusual in this *Dutch* grant, when it conferred on the " free inhabitants" of *Hempstead*, in their collective capacity, the lands contained *in the grant. The associates of the six patentees named, meant the free inhabitants at large.

The inhabitants of *Hempstead* held their lands under the authority of this grant, until they obtained a new patent from Governor *Dongan*, in 1685. This last patent was procured by the agents of the town, appointed at regular town meetings, and for the use of the town. This appears from the proceedings of town meetings held in *October* and *December*, 1668, and *April*, 1685. And at a town meeting in *December*, 1684, it was voted, that every person in it, possessed of any land, whether by proprietary, by purchase, or by gift, should have a right in all the commons in the township, proportionable to the lands they possessed, provided the whole town joined to procure a general patent for the whole township.

It appears that, in the interval between the two patents, lands had been granted, from time to time, to individuals, by gift, lease, or purchase, but always by the town itself, in its regular town meetings. The records are full of these grants to individuals; and the town, in its corporate capacity, exercised, as owner, a complete and uninterrupted power over the lands in the patent. Then came the patent of *Dongan*, which is the foundation of their present title. It refers to the grant of the lands of the township by the former *Dutch* patent, and grants, *ratifies*, and *confirms*, unto six patentees named, for and on behalf of themselves and their

1817.

DENTON
v.
JACKSON.

The several towns in this state are legal communities, or bodies politic, for certain purposes.

[ *326 ]

The *English patent*, in 1685, to *Hempstead*, is a confirmation of the former *Dutch* patent, and was intended for the same corporate purposes.

And the freeholders and inhabitants, in their town *meetings*, acted in their collective capacity, in regard to their common lands, as well as in the choice of town officers, &c.

[ * 328 ]

associates, the *freeholders and inhabitants of the said town*, their heirs, *successors*, and assigns, the tract of land aforesaid, *with all the privileges and immunities belonging to a town*.

I am persuaded that this patent intended to follow the other in conferring title, and did not mean to place the lands in different hands, and under a different control and succession. It professed to be a ratification and confirmation of the former grant in that particular. It defines the associates to be " the freeholders and inhabitants of the *said town." It uses, like the other, the word *successors*, which is a well-known technical term applied to corporate succession, and it couples with the grant of the lands *all the privileges and immunities belonging to a town*. Both parties had the same object in view, the town who applied, and the government who granted.

From the date of this patent down to the division of the town, and even to this day, the control and disposition of the lands in the patent were exercised by the town, exclusively, in its regular town meetings. The uniform character of the property undisposed of by the town, was that of town commons, and not individual property. It was always governed, considered, and disposed of, as town property. The town meetings exercised, in this respect, a steady, exclusive, and unquestioned jurisdiction. The grants to individuals, even to the patentees named, as the grant, for instance, of the 23d of *January*, 1704, to *John Jackson*, were town meeting grants ; and these meetings were the ordinary regular town meetings for the civil concerns of the town and the election of its officers. The title and language of the meeting were the same, whether its business was the election of a supervisor .or the management of their common lands. There is no color or pretence, as the evidence strikes me, for the suggestion that the meetings acted in one character when town officers were elected, and in another character when a vote was taken touching this property. There is no' such distinction to be discovered. The books of entries were all town books, and the orders were entered as town orders, by the town clerk ; and we should do great injustice to the candor and simplicity of that people, if we were to suppose that any such *latent* distinction was understood or intended. I will not stay to examine any minute or unessential variation that might, perhaps, now and then, be detected in the plain untechnical journals of this town, for the space of a century and a half. It is more fit that we should determine *the character of their proceedings from the uniform tenor and combined view of the whole.

To cite the instances in which the town, in its collective capacity, regulated and disposed of the unappropriated lands

under the patent, would be to transcribe the town records at large, from the date of the patent to the division of the town. (a)    There does not appear ever to have been a question, in all their town meeting discussions, and votes, and protests, as to the *right* of the town to regulate, divide, and dispose of their common lands.    The patentees and others would sometimes question the fitness, but never the authority of any resolution.    This could not have been thought of, since every man in the town, who possessed lands separately, held them under that same authority.    The uniform and universal understanding was, (so I construe the evidence,) that the undivided lands belonged to the town, and were subject to its exclusive regulation and disposal at town meetings.    This was also the uniform practice; and, indeed, town meetings are the only legal organs through which the freeholders and inhabitants can declare their united will.

*There were several acts of the colonial legislature, which assumed the fact as notorious and undisputed, that the common lands were the common property of the town.    This was particularly the case with the acts of the 17th of *June*, 1726, and the first of *November*, 1733 ; and the last act is stated to have been granted upon the prayer " of the freeholders and inhabitants of the said township."

I shall not undertake to detail the parol proof.    It is quite inferior to the force of the documentary evidence, since it cannot reach beyond the memory of the present generation.    But even this proof is decidedly in favor of the conclusion to be drawn from the language of the records of the town.

But there is one document, which may be thought to hold a different language.    I allude to the deed of *John Jackson*, of the 17th *April*, 1722.    He was the survivor of the six persons, whose names were mentioned in the patent from

*Margin notes:*
1817.
DENTON
v.
JACKSON.

· [ * 329 ]

*John Jackson,* the last surviving patentee named in the *English* patent, could not, by

---

(a) The town meeting votes or resolutions, which were particularly selected and mentioned by his honor, were those of the

| | |
|---|---|
| 25th January, 1686. | 7th April, 1741. |
| 2d November, 1686. | 6th ——, 1742. |
| 5th August, 1687. | 5th ——, 1743. |
| 28th December, 1688. | 1st ——, 1746. |
| 1st April, 1690. | 19th July, 1748. |
| 24th December, 1690. | 3d April, 1750. |
| 19th October, 1691. | 1st ——, 1755. |
| 15th March, 1696. | 19th ——, 1757. |
| 23d January, 1704. | 31st August, 1761. |
| 2d April, 1705. | 1st Tuesday in April, 1764. |
| · 1st ——, 1707. | · 17th June, 1765. |
| 11th January, 1714. | 1st Tuesday in April, 1772. |
| 5th April, 1715. | 5th April, 1774. |
| 3d ——, 1716. | 1st Tuesday in April, 1779. |
| 7th ——, 1730. | 1st ————, 1780. |
| 6th ——, 1736. | |

DENTON
v.
JACKSON.

his deed of the
17th April,
1722, enlarge
or abridge the
rights of the
town to its com-
mon property.
under the pat-
ent; nor could
it limit or desig-
nate the *asso-
ciates* of the
patentees.

Governor *Dongan*. This deed seems to have been intended by him as a declaration of trust, on the ground, probably, that the fee at law was in him, instead of being in the free-holders and inhabitants of the town. It declares who were the associates intended in the patent; and he makes them to be those who entered their lands at the time of the assess-ment in 1685, of 2½d. per acre, to defray the expenses of procuring the patent. But this act of his, and which was probably done for greater caution, could neither enlarge nor abridge the right of the town to its common property. It could not change the associates defined in the patent itself; nor do I perceive what material operation it can have in this case, except that it destroys the notion of private individual right, and admits that he was a trustee " in the behalf of the town," and that his object was " to settle the said town in peace," and that there might be "a right understanding amongst the associates, freeholders, and inhabitants of the

[ * 330 ]

same." *This deed only comes in aid and furtherance of, and is not in opposition to, the title of the town.

This deed attempted to do one thing which *Jackson* had not the power to do. It undertook to limit the associates from being, as they were declared to be by the patent, the freeholders and inhabitants at large, to be those only who contributed to the expense of obtaining the patent. And as this point forms one ground of the present suit, it will require some further examination.

2. It is contended, that those who contributed to that ex-pense, and their heirs and assignees, are entitled, under some ancient vote or resolution of the town, to the undi-vided property, and to the aid of this Court, in compelling a division of the common lands upon that basis. This position seems to admit the title in the town, and that it is bound, in consideration of the contribution, to carry its resolution into effect.

The patent charge was paid, in the first instance, by an assessment upon the inhabitants, of 2½d. an acre, according to the quantity of lands they then individually possessed. As early as 1686, the assessment had been made and partly levied, and a warrant issued for the remainder. The per-sons assessed were, probably, all the inhabitants who had any possessions, or were regarded as having any interest in the town; and the rate of assessment was naturally adopted as a fit rule of distribution, whenever the town came to con-sider the question of a division of their common lands. Thus it appears, that in *April*, 1687, there was a list of the names of the inhabitants, to the number of 160, who had made entries with the town clerk, of the amount of acres they possessed, and which were assessed at the rate afore-

said, towards defraying the expense of the patent charge. Afterwards, at a town meeting, in *February*, 1706, it was voted, that all former gifts and grants should stand good, and that if every man had not had his just right or division, (alluding, probably, to some prior division or parcel *of their lands,) he should have it, on making his right appear to the town. It was, at this same meeting, resolved, that all the undivided lands should be divided to them that had justly paid to the patent, according to what they had paid.

This last resolution appears not to have been acted upon, and it was probably not intended to apply to the plains and beaches now in controversy. But no resolution of the kind, not carried into effect and executed, was binding upon a subsequent town meeting. It was not in the nature of a compact with certain individuals, incapable of being revoked, and susceptible of being specifically enforced. There was no mutuality in the case, and scarcely the semblance of a consideration, for the little nominal assessment that each possession had paid, say twenty years before; for the charges on procuring the patent, applied to the patent at large, which covered all their individual possessions and grants under the town. The interest that each person had in the undivided lands, was merely as being an inhabitant of the town, or, as he may be termed, in relation to the subject matter, a member of the corporation. But I consider a vote or resolution of the town to divide their common lands, upon whatever plan, as subject to modification or repeal by a subsequent vote, provided no act had been done under it, by which individual rights have become vested. It was an act of legislation over the subject; and no private right arose and became vested, unless a division was actually made and confirmed. Our statute, relative to town meetings, expressly admits, that their regulations, concerning their common lands, may be altered or revoked. It would be contrary to all precedent and principle, to undertake, in this Court, to enforce specifically such a vote. There must be a clear vested right, founded on a contract mutually binding, precise and certain in its terms, and made for an adequate *consideration, before this Court can, consistently with any sound rule or discretion, interfere.

The deeds which the plaintiffs have produced, of sales of the interest which the grantors claimed in those commons, by purchase, or inheritance from those who had paid their assessed proportion of the expenses in procuring the patent, are no evidence of right. The individuals who trafficked in these assumed rights, may have attached value to them, under the impression that the common lands, when divided, would be divided and apportioned according to that assess-

1817.

DENTON
v.
JACKSON.

[ * 331 ]

Votes of *town meetings*, relative to the common property of the town, unless carried into execution, may be altered or rescinded by subsequent town meetings.

[ * 332 ]

259

1817.

DENTON
v.
JACKSON.

ment. But these impressions of individuals gave no new or binding force to the resolutions of the town. They remained as before, subject to any alteration, or repeal, that the town might subsequently deem meet; and I think it is very probable, that no town resolutions to divide their commons, however general in terms, which were of a date prior to 1752, were intended to apply to the plains and marshes now in controversy.

Those plains are of such great extent, and so naked and unfertile, that it is not probable they would, in those times, have been deemed worth the labor and expense of fencing and cultivating in small private farms. It is notorious that they have continued an immense waste down to this day. We find that when the town meeting, in 1723, voted that all their lands, not yet laid out, were to be divided to every person, according to what he had justly paid to the patent, they expressly excepted the plains, which were to remain in common until further orders. In *April*, 1745, the subject of the plains came again under consideration, and persons were appointed to consult whether they should be divided, or fenced from other towns. At last, a town vote was obtained, on the 30th of *March*, 1752, that the plains should be divided according to every person's right in the patent, and persons were appointed to carry this resolution into effect. The committee were to *judge and adjust men's rights,*

[ * 333 ]

*as they should appear to \*them.* Under this resolution, there were continued appropriations, for many years, not indeed of the principal part of the plains, but of small detached parcels of land around the skirts and edges of them; and these were granted to individuals, as they, from time to time, presented their claims. The quantity of land claimed and allowed, was according to the ratio, or proportion, of one acre for every $2\frac{1}{2}d.$, or five acres for every 1$s$. of the original assessment. There is such a singular coincidence between the lands allowed and this ratio, that it could not have been accidental. In this way, the claims founded on the original assessment to pay the expenses of the patent, were probably satisfied, without having any application or pretence to the great body of the common lands. These appropriations continued to be made, down to the year 1767, and from that time forward, as I apprehend, the books are silent about any further division. This vote of 1752 was the last resolution on the subject, and this did not apply to the marshes and beaches, which are also the object of this suit, and which, together with the great body of the undivided plains, continued to be the subject of town regulations. It is a just presumption, that all claims, founded on this very ancient pretext, were presented, and passed upon, and ex-

The *plains, marshes,* and *beaches,* included within the original patent to the town of *Hempstead,* continue the common property of the town,

tinguished, between 1752 and 1767, and that those not ex-
hibited (if any such there were) became obsolete, and were
deemed to be abandoned.

This last effort towards a division of the plains, if it meant
any thing more than to satisfy the claims, in the ratio which
was adopted, had essentially failed; and, no doubt, they
have been thought to be more conveniently and usefully
held as corporate or common property of the town, for com-
mon pasturage, than in any other way. It is, perhaps, for-
tunate that the ancient grants and usages are susceptible of
that construction. Judging from the past, it is *doubtful
whether the plains will be ever worth fencing into small
private farms, or even of being cultivated, further than by
gradual and almost imperceptible encroachments. This,
however, is a question fitly confided to the inhabitants of
the town.

To undertake, now, to compel a division, to satisfy any
remaining outstanding claims, founded on the assessment of
1685, would (if there were no other difficulties in the way)
be giving a most dangerous and unprecedented sanction to
a demand, feeble in its origin, and stale from its antiquity.
If ever time formed an equitable bar in any case, this is that
case. The claimants amounted to 165 persons, upwards of
130 years ago, and they must, by this time, have become
exceedingly multiplied and dispersed. To undertake to
ascertain the certainty and extent of those claims, would be
now very difficult and dangerous, if not impracticable. The
true and sound remedy for such a case is, to stop the in-
quiry, by the application of the legal presumption that every
just claim was satisfied before 1767, and that all litigation
now is barred by the acquiescence and laches of parties, and
by the lapse of time. I cannot conceive of a more feeble
ground, than that of this assessment of 1685, for compelling
a division of all the common lands of *Hempstead*, when we
take into consideration its small original amount, its original
object, the satisfaction it has received, and the time it has
lain dormant.

I am thus satisfied, from every view of the case, that the
plaintiffs, as private individual claimants, are not entitled
to call for the aid of this Court to compel a partition of these
lands; and I am further of opinion, that they were common
undivided property, belonging to the freeholders and inhab-
itants of *Hempstead*, at the time of the division of the town
in 1784. There is then no foundation for the present bill.
The town of *North Hempstead* *is not a party to the bill;
and, therefore, it is not a question properly arising in this
case, whether the freeholders and inhabitants of *that* town
continued, in their new corporate capacity, to hold a share

except such
parts of the
plains as have
been granted,
by regular town
meetings, to in-
dividuals.

[ * 334 ]

The assess-
ment of 1685,
of the sums
which the free-
holders and in-
habitants were
respectively to
contribute to-
wards the ex-
penses of ob-
taining the pat-
ent from the
*English* gov-
ernor, furnishes
no ground for a
partition of the
common prop-
erty of the town
among individ-
uals, especially
after the lapse
of more than a
century.

The *plains*,
&c. remained
common undi-
vided property
of the town of
*Hempstead*, at
the time of its
division into
two towns, in
1784.

[ * 335 ]

1817.

DENTON
v.
JACKSON.

Whether the new town of North Hempstead is entitled to any share in that common property? Quære.

But private individuals of that town cannot file a bill to settle any question relative to the common rights of the town.

in those common lands. I cannot concur in the suggestion, that any freeholder or inhabitant of *North Hempstead* may, when he pleases, file a bill in behalf of the town, and bring its common rights into discussion. In respect to property held in common, a town is a corporate body, acting by the proper organ of its will, a legally assembled town meeting. Without a resolution, recorded by the town clerk, I do not think there would be the requisite evidence of the will of a town to commence a suit respecting its rights. It appears to be altogether inadmissible, and destructive of order and peace, to admit private individuals, of their own mere motion, to carry on a suit in behalf of the town, respecting its common property, and without the knowledge and consent of the town, duly declared.

But admitting that I am mistaken upon this point, and that there are really sufficient parties before the Court, to bring into discussion the right of the town of *North Hempstead* to a share in these undivided lands, I should still be of opinion that the suit is not to be sustained. On this point, however, I wish to be understood as not giving any decided opinion, because I do not believe it to be necessary. I will merely suggest some very great difficulties in the way of the claim, if any there be, on the part of that town.

The common lands that lie within the bounds of *Hempstead*, and which belonged to that town before the division, must be under the exclusive regulation of the freeholders and inhabitants of *Hempstead*, as the inhabitants of both towns cannot assemble in joint meeting for that purpose. This exclusive power of regulation is one necessary attendant on exclusive right.

[* 336 ]

The erecting of a new town, does not take away or impair the rights of the old town, in regard to its common property, unless there be some special provision in the act erecting the new town, for that purpose.

So when a new town, or a new county, is erected out of an old one, it loses its right to the use of the town property, which remains in the old town,

*The lands belonged to the town as a community, in its corporate capacity. The erection of a new town cannot impair the rights of the old one, and the new town has none but what are given to it at the time of creating it, or subsequently. Its power is confined to its own limits, and, without some special provision, it cannot, as of course, possess any control or rights in or over lands lying within another town. Thus, for instance, if a town owned a school-house, or a poor-house, or a church, or a town-house, or a cemetery, it is not to be presumed that the new town would have any right to the use of such property, though the inhabitants of the new town may have contributed to the expense of it. Such things are necessarily local and exclusive in their enjoyment. When a new county is erected out of an old one, it loses entirely its share in the title and its right to the use of the court-house and gaol remaining in the old county, though built at the common expense.

The act dividing the town of *Hempstead* included some part of the plains in *North Hempstead*, and the greater part in *Hempstead*. If it was not intended that each town should enjoy exclusively the commons that fell within it, some express provision would probably have appeared in the law. The line of division may have been made in reference to those very commons. One part of a town may have better land, better harbors, better access to markets, and, perhaps, more wealth than another part; and when the line of division comes to be made, the parties themselves may throw the greatest part of their common lands into one scale, to balance the greater advantages in the other. Many local reasons may occur in establishing lines of division, founded on the very fact, (and which, I believe, is the general understanding,) that each town takes to itself, unless otherwise specially provided, the common lands that fall within its bounds. This is also the case when a new state is erected out of an old one. In the present instance, *there was nothing in the act of 1784 to repel the natural and necessary inference, that each town took what common lands and common privileges fell within its limits, and no more. There was one special provision in that act, giving the inhabitants of each town, reciprocally, the right of catching oysters, fish, and clams, in the creeks, bays, and harbors of the other. This express reservation on one point, and consequent silence on all others, affords a strong presumption that no other reciprocal rights, upon each other's common rights, were intended to be reserved.

It is said, however, that in the subsequent act of 1788, being a general revised act, relative to towns, the right of each town in the common lands of the other was revived. But in answer to this, it may be said, that we can hardly presume the legislature intended to interfere with rights absolutely vested and fixed under preceding laws. We ought not to recur to this construction, if the act be susceptible of any other, and especially of one quite as easy and rational. The general proviso in the act of 1788, that " none of the bounds or lines by this act shall take away, or abridge, or affect, the right or title of any person or body politic in any manner whatsoever," was not intended to be taken in a literal sense. The act did, certainly, take away the right or title of the people of *North Hempstead* to go and vote, as they formerly used to do, at the town meetings in *Hempstead*. That right was lost, and a new one given to them by the act. Strictly speaking, the new town of *North Hempstead* had not any previous right (and it was pre-existing rights that the act alluded to) to be abridged or taken away. They were, for the first time, created a

though acquired at the common expense of all the inhabitants, before the division; unless there is some express provision to the contrary.

Each town takes to itself, unless otherwise expressly provided, the common lands that fall within its bounds.

[ * 337 ]

The general revised act of 1788, relative to towns, made no change in the law in this respect.

town or body politic, with a right to regulate their own common lands, but not the lands of others. To say that the town of *North Hempstead* have no right or share in the common lands within the bounds of *Hempstead*, is not taking away, or abridging, any of their rights; for, as a *town, they never had such a right. That saving clause, therefore, has nothing to do with this question.

It is further understood, that so far as the plains fell within the bounds of *North Hempstead*, the inhabitants of that town have acted, as to them, as well as to their other town property, as if each town owned exclusively its own commons. This appears from their town meeting resolutions, from *April*, 1785, to *April*, 1808. They have not only put that construction upon the act, but there is evidence to infer an adverse exclusive possession of the commons in *Hempstead*, by the town of *Hempstead*, for 20 years after the division, and before the filing of the bill. If so, this would, probably, form a legal bar to their claim, however otherwise well founded. A prescription of 20 years will bar a claim to a right of common.

These are some of the difficulties which have arisen in my mind as to a claim on the part of *North Hempstead*, if they were now a party to the suit. But I have not formed, and wish not to express, any decided opinion on this point. It is sufficient, in this case, that the plaintiffs, as individual claimants, have no title; and the bill must, consequently, be dismissed, with costs.

Bill dismissed.

264