Mr. Justice James
delivered the opinion of the Court:
The United States brings this suit as owner of the streets óf Washington. The bill alleges that the defendant Cole, a married woman, claims to own in her own right, and is in possession of lot 1 in the subdivision by the heirs of John Davidson, of square 213, fronting 126.38 feet on M street north, 115:50 feet on Massachusetts avenue, having a westerly boundary line of 51.30 feet, and running to a point at its eastern end, as shown by an exhibit filed therewith ; that a part of said holding lias for many years been improved by a brick dwelling, -while the eastern part — that is to sa3r, the part running to a point — fronting 55.68 feet on M street, and 52.8 feet on Massachusetts avenue, has been vacant; that on September 17,1888, the owner commenced building-foundation walls for a brick structure on the vacant part of said lot, placing them partly coincident with and partly exterior to the outer lines thereof, as shown by the exhibit referred to; that at the time of the filing of this bill (October 10, 1889), she had built up the said walls to a height of 10 feet above the ground, and purposed carrying them to the height of three full stories and a basement, and that, so far as these walls lie outside of the lines of her holding, they are entirely on complainant’s land.
. It is further alleged that the defendant Cole is acting in the premises under the pretended authority-of a so-called permit, issued by the defendant, Entwistle, as “Inspector of Buildings,” with the consent, authority and approval of the District Commissioners, and that, although the building in course of erection is designated in the permit as an addi tion to the building standing on the other part of the lot, it *509 is designed and intended to be used as a separate and independent dwelling house. It is charged that the permit is insufficient in law to authorize the erection of said building, and is void so far as it pretends to authorize the erection of walls exterior to the lines of the defendant Cole’s individual holding; that the erection contemplated would involve an invasion of complainant’s property, and would constitute a public nuisance. The prayer is that she be enjoined from further proceeding with the erection of the building, and required to remove such parts already erected as lie outside of the building line.
The answer of defendant Cole sets up that no part of the structure complained of is upon that part of the sheet or avenue named which is used for public travel, but that the whole of it is only upon her own lot and the contiguous parking; denies that it is upon any part of the street used by the public, or that it will obstruct travel or offend good taste, and claims that it will be an archictectural ornament rather than a public nuisance.
The joint and several answers of the Commissioners of the District and the Inspector of Buildings set out the history of the authority to make building regulations, and state that in pursuance of the authority gm;n by the Act of Congress of February 21, 1873, the Board of Public Works, with the approval of the legislative assembly, adopted a general [dan for the improvement of the streets and avenues, and, as a part of said plan, caused a space 3 8 feet wide to be parked next adjoining the building line on M street, and a space 40 feet wide to be parked on Massachusetts avenue next adjoining the building line, adjacent to defendant Cole’s property, and encircling the eastern apex thereof; that this parking has ever, since remained, and is inclosed by a suitable fence; that outside of it there isa foot-way 12 feet wide on M street, and 15 feet wide oh Massachusetts avenue, and that M street is 90 feet, and Massachusetts avenue 160 feet wide where said Cole’s property borders thereon. *510 The answer further sots out, by exhibit, the building regulations made by the Commissioners under authority of the Act of Congress of June 34, 3878. 20 Stats., 133.
It appears by the exhibits that Mrs. Cole’s original application was'for a “permit” to build “a three-story and basement brick addition, 24 feet by 46 feet, including a projection 5 feet b3r 44-J feet on Massachusetts avenue, and one on M street 5 feet bj" 48 feet,” according to a plan submitted ; but that afterwards a different plan was submitted to and approved b}r the Commissioners, and permit was issued according^, by which two projections on Massachusetts-avenue, and two on M street — -one on either side of an entrance from those streets respectively — were provided for. The projection on the west side of the entrance from Massachusetts avenue was to be 5 feet from the building line and 16J feet wide; and that on the east side w-as to be of the same depth and 26-J feet rvide. On M street the projection west of the entrance was to be 5 feet deep b3T 36 feet wide, and that on the east side was to be of the same depth and 29 feet wide. According to the exhibit of plan the projections on Massachusetts avenue and M street, east of the entrance referred to, touched the building line only at tlieir western ends. From those points they extended eastward ivithout returning to the building line, and encircled the apex of Mrs. Cole’s lot; thus connecting the projection on Massachusetts avenue with that on M street. The actual foundations and walls referred to in the bill ivere constructed on that plan.
These facts raise the question whether the building of these projections into the parking is lawful, and the manner of considering it is fairly stated in two averments of the bill and answer. The bill alleges “ that the permit is insufficient in law to authorize the erection of said building, and, so far as it pretends to authorize the erection of walls exterior to the lines of defendant Cole’s individual holding, is null and and void.” The answer of the Commissioners *511 alleges: “ That the building regulations are in law and equity a complete authority for the structure now building.”

*0

*511 It is unnecessary for us to consider again the power of the Commissioners tot make building regulations. As Mr. Justice Hagnor said, speaking for the court in United States ex vel. Strasburger vs. The Commissioners, 5 Mackey, 389 (393), the Act of June 14, 1878, seems to have been designed to confer upon the Commissioners a power with respect to building regulations of the most comprehensive character. It authorizes and directs the Commissioners ‘to make and enforce such building regulations for the said District as they may deem advisable; ’ and it declares that ‘ such rules and regulations made as above shall have the same force and effect within the District of Columbia as if enacted by Congress.’ There is no limitation to the character and extent of the regulations thus authorized, but the terms are broad enough to include every form of building regulations that the Commissioners may deem advisable, and which may reasonably be considered as a proper subject of regulation.”
But it is to be remembered that the streets and avenues of Washington are the property of the United States (Van Ness vs. The Mayor, &c., of Washington, 4 Peters, 232); and as it may he said that authority to-subject to private and individual use lands belonging to the United States, is a substantive power, and, therefore, is not included, as an incident, in even the most unrestricted power to make regulations about buildings on individual holdings, it is necessary to consider whether this substantive power has also been granted, either expressly or by implication.
As a rule of construction it must be assumed that in granting to the Commissioners power to make building regulations, Congress has had in mind and acted with reference to what had already been done under tire name of making building regulations, and we find that “building regulation No. 2,” published by President Washington July 7, 1794, *512 authorized areas 7 feet in breadth in the streets immediately adjacent to buildings; that under the amendment to the charter of the city of Washington, passed May 15, 1820, authorizing the corporation “ to regulate, with the approbation of the President of the United States, the manner of erecting and the materials to be used in the erection of houses,” an ordinance ivas passed on the 30th of March, 1822, authorizing the construction by property owners of vaults under sidewalks, and of areas, steps, cellar doors and colonadcs, or open arches, all of them to project, within variable specified limits, beyond the building lines of private holdings, and, finally, we find that on the 16th of Januaiy, 1871, the chy council of Washington authorized the projections specifically known as bay-windows. In view of such previous exercise of power to authorize, under the head of regulation of buildings, the occupation of streets by permanent projections, it cannot be doubted that the authority vested in the Commissioners in 1878 to make building regulations carried with it power to provide for the occupation of the streets by such permanent projections as bay-windows, notwithstanding such power over the property of the United States ivas substantive, and not incident to the power to make regulations aboui buildings erected on private holdings. We must, therefore, hold the building regulations existing when this'permit was granted to have the same effect until regularly altered by the Commissioners, as if they had been enacted by Congress.
What building regulations, then, apply (o the structure in question? We are referred bjr both parties to section 7 of the regulations, which contains the following provisions: “Projections from the building lino of any street or avenue eighty feet or more in width shall not exceed the following distances: Areas eight feet on parked streets and six feet on unparked streets; show-windows three feet, bay-iuindows and tower projections five feet on parked streets and four feet on unparked streets; steps nine feet on unparked streets, *513 twelve feet on parked streets, unless otherwise determined by the Inspector of Buildings, when, in his opinion, the parking is of sufficient width. * * * No fire-place or chimney shall be constructed in any projection outside of the building line, unless the shaft return to the building line and be carried upon iron beams. .
“Bay windows and tower projections shall not exceed fourteen feet in width, unless approved by the Engineer Commissioner ; and on a building twenty feet or less in width, the building line front must be preserved by not less than three feet six inches. On buildings fifteen feet and less in width, by not less than two feet six inches; on buildings over twenty feet and under thirty-five feet front, by not less than four feet ten inches; spaced as approved by the Inspector of Buildings. But one projection will be allowed on a building thirty-five feet and less in width. On larger fronts the projections shall not aggregate more, than fifty per centum of the frontage of a principal or entrance front, and forty per centum of a side front, exclusive of corner tower projections.”
We were also referred at the argument to section 1 of the regulations, for the following definitions, as showing the meaning of the foregoing provisions:
“Building Line. — The line of demarcation between the public and private space.”
“ Bay- Window. — A first floor projection for a window, other than a tower projection, or show-window.”
“Oriel Window. — A projection for a window above the first floor.”
“ Tower Projection. — A projection designed for an ornamental door entrance, for ornamental windows, or for buttresses.”
It was assumed on both sides at the argument that the projections in question, ■whether they conformed to the regulations or not, must belong to the categories of' either bay-windows or tower projections; and we do not find anywhere *514 in the building regulations any other class of projections to which they could belong. The question then, is, whether they conform to the regulations concerning these particular subjects. In determining this question, it is proper to interpret, in the first place, the meaning of the definitions referred to. We think that when they define a bay-window to be a “ first floor projection,” and an oriel window to be “a projection for a window above the first floor,” it must be understood that a bay-window does not include and perform the office of an oriel window; in other words, that a bay-window is strictly a projection one story high. The definition of tower projection, on the other hand, does not speak of the stories from w'hich it may project; but the word “ tower,” and the fact that the definition prescribes no limitation, indicate that such a projection, beginning at the foundation, includes several stories. When this bill was filed the walls had been built only about 10 feet high, and did not include the whole of even the first story; but the permit was for projections which should include a basement and three stories. It purported, therefore, to authorize the constrution of tower projections. This distinction is onty important for the sake of clearness, inasmuch as the rule of projection and width is not varied by it. The rule as to those dimensions applies to bay-windows and tower projections alike.
We proceed, then, with tower. projections. We find that the regulations describe all projections, of whatever kind, as “projections from the building line of a street or avenue.” In other words, they authorize projections where there is such a building line, and do not authorize projections from something which cannot be considered a building line, thus making the building line the basis and condition of the privilege. In this case, for example, they authorize projections from the building line of Massachusetts avenue, and the building line of M street; but the apex of Mrs. Cole’s lot, where these building lines are interrupted, is not itself, *515 in any sense, a building line, and these regulations do not authorize any projection from and in front of that apex. It is clear, we think, that what Congress intended to empower the Commissioners to license, and what, accordingly, the regulations propose to license, is the enjoyment, by a private holder, of certain privileges in front of his holding. Whether there was any reason of public interest for not extending these privileges into the space beyond the point at which the building lines terminated in an apex we need not decide; we simply hold that when all projections must be from a building line, this apex cannot be treated as if it were a third building line, and made the basis or point for a projection toward Thomas Circle.
On referring to the exhibit showing the plan submitted to and approved by the Commissioners, we find an apparent attempt to meet the objection that this apex was not itself a base for a projection. The figures and red lines indicating the length of the projections on Massachusetts avenue and M street, respectively, evidently include the projection beyond the apex as a part of those projections, showing the former to be 26 feet, 6 inches, and the latter to be 29 feet. And on referring to the application for a permit to build, we find that it describes the proposed projections as “ two projections on Massachusetts avenue 16 feet 6 inches, and 26 feet & inches wide, and two on M street, 16 and 29 feet wide,” showing conclusively than the plan includes the projection beyond and east of the apex as a part of the projections on the streets. It is hardly necessary to say that, as projections on those streets, such extensions 5 feet beyond the point at which the Massachusetts avenue and M street fronts of Mrs. Cole’s lot terminate, are not authorized by the regulations.
It may be added that we learn from a plat showing the projections from buildings on other similar points around the same circle — which, if not made an exhibit, was drawn in the office of the District Engineer, and was agreed by *516 both parties at the argument to be correct — that the construction of the regulations which we have just announced must have been adopted by the Commissioners in former cases. What appear to be corner-towers of Mrs. Dahlgren’s house, at the opposite and corresponding apex, formed by the intersection of the building lines of Massachusetts avenue and M street, and of the Portland flats, at the intersection of the building lines of Vermont avenue and Fourteenth street, are projections from the building lines of these avenues and streets, respectively, and do not encircle or extend beyond these apexes.
Tt is true that the structures referred to were.erected under the regulations of 1882, but those regulations no more permitted this extension beyond the apex than the present rules do. We are, therefore, of opinion that in any respect a projection beyond the apex of Mrs. Cole’s lot is unauthorized by the building regulations.
We observe, in the next place, that the projections on Massachusetts avenue are (if we omit the projection of 5 feet beyond the apex) 16 feet 6 inches and 21 feet 6 inches, and on M street 16 feet 6 inches and 24 feet. It is claimed by the defendants that a permit for projections having such widths was authorized by the following clause of the regulations: “Bay-windows and tower projections shall not exceed 14 feet in width, unless approved by the Engineer Commissioner.”
Substantially, this is a provision that the Engineer Commissioner may, in each case and independently of all others, authorize any dimension over 14 feet that he may think fit. It seems to have been imagined by the Commissioners that by making a rule that the Engineer Commissioner might act at his discretion in this matter; in other words, without rule, they had satisfied the requirement of the statute that they should make rules about the same matter. To call this a rule about bay-windows and tower projections is an abuse of words. It is merely a rule about the powers of *517 the Engineer Commissioner, and as such it is illegal and inoperative. It would have been equally so had the same power been reserved to the Commissioners themselves ; in other words, to the very persons who were charged with the making of rules and regulations. The power given to them by Congress 'was powTer to make rules, not power to provide that they would decide each case independently and without rule. There may be matters as to which it is competent for the Commissioners to reserve or to delegate to others discretionary powers; but this is not one of them. Prom the time of President Washington’s regulations down to the time when .this power was vested in the District Commissioners, the appropriation of the public spaces for any kind ■of projections from private holdings has always been the subject of fixed and general rules; and it is a necessary conclusion that Congress intended that it should stand on that footing.
As we have already suggested, this is not in its nature an incident, but a substantive power. It must be used in the very manner indicated — that is to say, by making general rules.
A case relating to this point was well considered and decided by the Supreme Court of Pennsylvania, in Peimer’s Appeal, 100 Pa. St.,' 182. An act of the Pennsylvania Legislature had empowered the city councils of PhiladeL phia “to make.and establish rules and regulations for the better regulation of jut or bay-wdndows.” The councils, without establishing any general or fixed rules, undertook, by ordinance, to grant a special permit to one Peimer to construct such a window, projecting at a point man}’- feet above the sidewalk, from the front of his private dwelling. The Commonwealth, by its attorney-general, filed an information in the nature of a bill in equity to restrain the defendant, Peimer, from maintaining the obstruction, which was alleged to constitute a nuisance. In an opinion adopted with the strongest commendation by the Supreme Court of *518 the State, the presiding judge of the Court of Common Pleas of Philadelphia County thus disposed of the ordinance which was set up as a defense:
“ The power to make rules and regulations which shall confer a general and common right in which all shall equally participate, does not authorize the granting to one and the withholding from another a permission to construct jut or bay-windows according to the caprice or will of councils. * * * If each case is to be individually acted upon and does not depend upon its conformity to a general rule this would be the result not only in regard to bay-windows, but for every other purpose for which it would be desirable to occupy the highway. This is characterized as special legislation on subjects of general interest and concern, forming no rule or regulation for all alike, but giving invidious privileges to the favored few at the expense of the many, which is contrary to the whole spirit and intent of the authority entrusted to the councils by this law.”
The principle of this case rests upon the broadest considerations, and if it was important to restrict by it the action of a representative and legislative body, it would seem still more important that it should be applied to the exercise of powers by officers who are neither of these.
Since, then, this pretended grant of discretionary power to the Engineer Commisioner is unauthorized and inoperative, and since the Commissioners themselves can only provide by general rules for the width of bay-windows and tower projections, it follows that any width greater than the 14 feet authorized by the general rule is unlawful.
There remains to be noticed another effect of the regulations. It is manifest that they require that bay-windows and tower projections shall be so constructed that both of their sidewalls shall touch and project from the building line; in other words, that such a structure must not only start from the building line on one of its sides, but return to it on the other. This much is indicated by the very phrase “ pro *519 jections from the building line.” Moreover, it is provided, in respect of buildings less than 35 feet wide, that, in making these projections, a certain amount of “building line must be preserved, * * * spaced as approved by the Inspector of Buildings.” This means that a part of the front of a building having a bay-window or tower projection shall consist of a wall standing on the building line, and that determines that the projection must, on both of its sides, project from that line. Now, although this provision is predicated of buildings less than 35 feet wide, and is not repeated in the next clause relating to wider buildings — which only provides that the aggregate of the several projections may amount to a certain percentage of the front of the building — it cannot be supposed that the general rule ceases in such cases to be applicable to each projection. The rule must require, then, that in this case also the two projecting walls must start from the building line from which the' structure projects. Now', it w7as precisely a disregard of this requirement that made possible the sort of structure permitted in this case. The projecting wall of the alleged tower projection starts from the building line of Massachusetts avenue at the east side of the door entrance, and never returns to any building lin,e until it has gone around the apex of the lot and returned to the building-line of M street at the east side of the door entrance on the latter street. This so-called “projection” is not, in the sense of the regulations, a bay-wdndow projection or a tow7er projection from either Massachusetts avenue or M street. It simply has the effect of a wall enclosing the defendant’s lot at some distance from the building line of either street. To the eye such a plan of construction suggests a large house built around a smaller holding; not such projections from that holding as Congress intended the Commissioners to authorize, nor such as their regulations actually permit. We think that this structure violates both the letter and spirit of the building regulations.
*520 The law has been most liberal in its concessions to the owners of private property'in Washington, and especially to the owners of property abutting on the parked avenues and streets. They have been permitted to adorn and enjoy the public spaces in front of their houses as if these were their private gardens. But the private holder has been reminded by the same law that even the very concessions which he enjoys are not made solely for his individual benefit, but also for the common welfare and enjoyment. In the language of the Commissioners’ answe.r, it was as part of “ a general plan for the improvement of the streets and avenues” that these parks were laid out, and they are still to be regarded as simply, the adorned portions of the streets. In contemplation of law and .of this street scheme, the common interest in their preservation is just as positive as it is in the preservation of the roadways.. When they were withdrawn by law from public travel, they were not wholly withdrawn from public enjoyment. Their public uses are wholly different, but in the eye of the law they are equally substantial. Beauty of surroundings and the gratification of taste may be provided for public use and benefit, just as comfort and safety of travel are so provided; and this interest of the public has been distinctly considered and recognized in the establishment of these parks, and in the provisions for their adornment, and for their maintenance and preservation. It is therefore not a matter of easy-tempered indifference that these spaces should be narrowed by unlawful structures, even to a small extent, nor even if such structures may offer the apology of being ornamental. If there is a remedy by which it can be done it is especially important that the beginnings of such wrongs should be stopped before they become common and more serious by toleration.- We have to consider, then, whether the proper remedy has been sought in this case.
It was suggested at the argument, on the part of the de *521 fendants, that, there is nothing peculiar in the ownership of the streets of Washington by the United States which should determine the nature of the remedy, since it had been decided in the case of Van Ness vs. The Mayor, &c., of Washington, 4 Peters, 232, that the United States might sell them. But we do not so understand the effect of that case. Throughout the opinion of Mr. Justice Story, speaking for the court, it was plainly recognized that the streets there in question were held by the United States in its political character. The true purport of that decision is well expressed in the syllabus prefixed by Mr. Curtis: “ The streets and public squares of the city of Washington, having been conveyed by the proprietors of the lands to trustees ‘ for the use of the United States,’ held: That the United States owned the lands in fee simple, and, in connection with certain public improvements, might sell portions of the same which were no longer useful as streets, and make title thereto.” It is plain that nothing in this case places the United States on the footing of an ordinary property owner in respect of the question before us. These streets are held by the United States as property, but in its capacity of a political body, and an encroachment upon such property is encroachment upon the sovereign, and is what is called purpresture.
Jurisdiction of cases.of this kind seems to have been exercised chiefly by the equity side of the exchequer, “which had,”' as Chancellor Kent observed, in Attorney-General vs. Utica Ins. Co., 2 Johns. Oh., 382, “ an appropriate jurisdiction, touching the property of the crown.” It is a recognized part of the jurisdiction, however, of the courts of equity. Story says: “ The jurisdiction is applicable not only to public nuisances, strictly so called, but also to purprestures upon public rights and property. Purpresture, according to Lord Coke, signifies a close or enclosure — that is, when one encroaches, or makes that several to himself which ought to be common to many. The term was, in the old law *522 writers, applied to cases of encroachment, not only upon the king, but upon subjects. But in its common acceptation it is now understood to mean an encroachment upon the king, either upon part of his demesne lands, or upon rights and easements held by the crown of the public, such as upon highways, public rivers, forts, streets, squares, bridges, quays and other public accommodations.” 2 Eq. Jur., Sec. 921. In this country the jurisdiction applies to encroachments upon the State.
Early in this century the courts of equity still spoke of the rare use of their jurisdiction of cases of nuisance. Attorney-General vs. Utica Insurance Co., 2 Johns. Ch., 332; Attorney-General vs. Cleaver, 8 Ves., 217, 218. In the first • of these cases Chancellor Kent remarked that, in eases'of public nuisance, in the only cases in which it had been exercised ; that is, in cases of encroachment on the king's soil, it had lain dormant for a century and a half, from Charles I down to the year 1795. Nevertheless it is now firmly established, upon the principle that equity can give more adequate and complete relief than can be obtained at law. City of Georgetown vs. The Alexandria Canal Co., 12 Peters, 98. The only case of purpresture decided by the courts of the United States to which we can refer is the United States vs. Brighton Ranche Co., 26 Fed. Rep., 218 ; Id., 25 Id., 465; This case came up first on exceptions to the answer before Brewer, circuit judge, and Dundy, district judge, at the May term, 1885, of the Circuit Court of the District of Ne- ■ braska. Judge Brewer said: “ The defendant has built a fence, partly on his own land and partly on land belonging to the Government, including a tract of several thousand acres. This is an action in equity to compel, by mandatory injunction, the defendant to remove its fence from the Government land, and thus leave the enclosed Government land free from all obstruction to approach. Of course the Government title is conceded, and its right to proceed by an action of ejectment to remove the defendant from occupancy *523 of any of its land is unquestioned. The question made is whether the Government can come into a court of equity and avail itself of the summary remedy given by such a court. We are of opinion that it can, and, whether the act of the defendant comes within the technical definition of purpresture or that of a public nuisance, we are of the opinion that the Government can come into a court of equity, and by its orders have an end put to this trespass on the public right. We think, too, an action of injunction is the appropriate remedy, and that an action of ejectment'would not furnish full protection to the Government. Generally speaking any encroachment upon the public domain may be restrained or ended by injunction, and in this case it was not the mere fact that the fence is built upon Government land, because such fence operates not only as an entry upon the particular land upon which the fence was built, but also to separate the enclosed lands from the general body of the public domain.”
This last observation indicates that the purpresture was also a nuisance; and it will be observed that, in the case at bar, the encroachment is not merely an entry upon the particular space occupied by the intruding structure, but operates to impair a system of street arrangement and improvement ; thus adding to the purpresture, as in the case cited, another ground for equitable interference.
The same case came on for final hearing at the November term, 1885, before Mr. Justice Miller, sitting as circuit justice. As the report is brief we think it important to quote the whole case, since the statement of facts shows the firmness of the court’s attitude on this question:
“This is a suit on behalf of the United States to obtain a mandatory injunction against the Brighton Ranche Company to compel it to remove a barbed wire fence 57 miles long, inclosing 52,000 acres of the public lands of the United States. The testimony disclosed that this fence stood partly on deeded lands, school lands, and lands *524 entered under the homestead, pre-emption, and timber culture laws of the United States. The testimony further disclosed that the fence was erected on these entered lands with the permission of the settlers. Inside the fence were a large number of acres of vacant public lands.”
Continuing he said: “ I am of opinion that the United States is entitled to its injunction, mandatory as to so much of the fence complained of as exists, and prohibitory as to building any future fences, so far as either of them comes within the following principles: (1) There exists no right in the defendants to build any fence on the lands of the United States. (2) All lands are, for this purpose, lands of the United States so long as the legal title remains in the United States. (3) It is the right of the United States and its duty to protect all such lands -from this misuse in cases where there have been any kind of entries, whether of pre-emption, homestead, or private entry, though the purchase money be paid, -so long as the legal title remains in the United States; except where these latter parties build their own fences, or give express license to others to do it. In these cases it holds the title in trust, and can maintain this bill to remove the fence or prevent its erection. A decree should be entered based on these principles.”
In this case the jurisdiction of equity to put an end to encroachment on the sovereign’s soil was applied where the sovereign held the legal title only in trust, and where the whole equitable interest was in private persons, on the ground that an interest and duty to protect the legal title from encroachment still remained in the sovereign ; both having become, indeed, only the more serious by virtue of the trust. On this principle, whenever the Government holds the soil for any kind of public benefit, this duty to protect it from encroachment must exist, and the courts of equity must have jurisdiction to aid in its performance. Indeed, the highest and the true ground of the right of *525 equity courts in this country to apply their summary remedies in cases of purpresture. is that the Government is not to be interrupted in its functions and duties, and is, therefore, peculiarly entitled to remedies which shall prevent or directly put an end to encroachments which tend to such interruption.
And if there is any case to which such considerations especially apply it is to encroachments upon the streets and squares of the city of Washington; and that for the reason that this city was established under the Constitution for the seat of Government. Because of its origin and purposes, the Government owes to the nation a peculiar duty to preserve and adorn it. It is not for its residents alone that its streets are bordered with parks, and its squares are decorated. It has at last become in fact what it was designed to be — the nation’s city. Sixty years ago its status and destiny were defined by the Supreme Court in the very case which decided that the United States might sell such of its streets and squares as should be found useless. In demonstrating that the original proprietors must have understood the full effect of their conveyance, the court said: “They might well, and indeed must, have placed a just confidence in the Government; that, in founding the city, it would do no act which would obstruct the prosperity, or interfere with its great fundamental objects and interests. It could never be supposed that Congress would seek to destroy what its own legislation had created and fostered into being. On the other hand,.it must have been as obvious that as Congress must forever have an interest to protect and aid the city it would for this very purpose be most impolitic and inconvenient to lay any obstructions to the free exercise of its power over it. The city was designed to last in perpetuity, Capitoliimmobile saxum.” Van Ness vs. City of Washington, 4 Peters, 232.
Surely a court of equity can have no more appropriate office than the protection of a plan devised in such a spirit *526 against the enroachments of individuals. The particular effect of a single instance of intrusion may not be serious, but toleration of a single instance is an invitation for another, and an ornamental intrusion is no more to be tolerated than one that is hideous.
When this bill was filed the structure complained of had .only been begun; but, with knowledge that .this court was charged with the determination of its character, and that its judgment might be adverse, it has, as we learned at the argument, been carried towards completion. The comment of the Supreme Court upon a similar course pursued by the defendant in the Wheeling Bridge Case, 13 Iiowc, 578, is applicable in all such cases. “ The bridge company,” said the court, “ had legal notice of the institution of the suit, and of the application for an injunction to stay their proceedings before their cables were thrown across the river. This should have induced them to suspend, for a time, their great work, alike creditable to the enterprise of their citizens, and the genius and science of the engineer who planned the bridge and superintended its construction. It is a matter of regret that, by the prosecution and completion of the bridge, they have incurred a high responsibility.”
The course pursued by the court in that great case is a precedent which we cannot disregard, when we reach the conclusions w'hieh we have commenced. The bridge was nearly a.thousand feet between the abutments, and was completed at immense cost. Yet the court, having decided that, at its existing height, it interfered with the navigation of the Ohio River, did not hesitate to say that, unless it should be raised to a certain height, the bridge must be abated.
Holding the opinion which we have expressed, we can arrive at but one result. So far as this structure is an unauthorized intrusion on the public space it should be abated.
A decree wall be drawn according to these principles.