## PROCEDURE FOR THE CONSOLIDATION OF CHURCHES.

. Common Pleas Court of Muskingum County.

THE FIRST UNITED PRESBYTERIAN CHURCH OF NEW CONCORD, OHIO, v. J. A. YOUNG ET AL.

Decided, 1919.

*Religious Societies—Attempt to Consolidate an Incorporated and an Unincorporated Church—Function of Boards of Trustees—Statutory Remedies which are Cumulative and not Exclusive—Dissenting Members may not Enjoin a Consolidation of Churches, When.*

1. The corporate powers, business and property of an incorporated religious society are vested in, and must be exercised, conducted and controlled by, its board of trustees in accordance with the provisions of Section 8660 of the General Code of Ohio; and a suit in the name of the corporation can not be maintained in violation of such requirements.

2. Sections 10004-10009 General Code, inclusive, pertaining to the consolidation of religious and benevolent societies and the transfer of property are in the nature of cumulative remedies and not exclusive, and therefore do not exclude or interfere with the common law remedies.

3. Where two local church organizations, having the same religious faith and working under the same ecclesiastical jurisdiction, by a vote of more than two-thirds of the membership of each body determine to consolidate, and such action of the churches in the completion of the union has been in conformity to the rules of such common ecclesiastical body and approved and confirmed by it, a group of the dissenting members of one of the churches, without calling or attempting to call the trustees of their church together for the purpose of acting in the matter may not, in the name of their corporate body, enjoin and prohibit such consolidation under the claim that such act of consolidation interfered with and deprived plaintiff of its property without its consent and in violation of its constitutional rights.

*H. C. Shepherd* and *C. F. Ribble,* for plaintiff.
*H. C. Pugh, E. F. O'Neal* and *C. Ellis Moore,* contra.

WEBER, J.

The facts in this case, as they appear from the pleadings and the evidence, are in substance as follows:

The plaintiff is an incorporated religious association and owner of real estate (described in the petition) in New Concord and also pulpit furniture, communion sets, and other personal property. There is also in that village another religious organization, unincorporated, known as the Second United Presbyterian Church. Both churches are members, and under the ecclesiastical jurisdiction of, the United Presbyterian Church of North America.

Plaintiff claims a membership of about three hundred souls and the Second Church something over two hundred. How many of them are said to be in good standing does not appear. In the winter and spring of 1917 and 1918, a movement was started in both churches, looking to a union of the two congregations and the formation of one new church.

To this movement some opposition developed. Each of the congregations, after notice to its members, by more than two-thirds of its members and a majority of the membership in each church, voted for the union, and, later, plans for union were prepared by committees representing each church, agreed upon, and reported back to the congregations, confirmed by those bodies, favorably acted upon by the Session of each church, and brought before the Presbytery for its action.

The Presbytery appointed a commission to investigate the matter of the proposed union and, after hearing the claims of both sides, including protests filed by the minority representation from each church, at three different meetings, decided in favor of the union, and so reported to the Presbytery. The action of the Presbytery in uniting the two congregations was later affirmed by the higher reviewing body, the Synod.

In the meantime, a clash came between a few of the protesting members of the First Church and about a like number of the United Church, over the rights of the new congregations to

hold services in the meeting house standing on the lot of the First Church.

Each side undertook to bar the other from entrance and this resulted in suit being brought by the First Church, or in the name of the First Church, to enjoin those who represented the new organization from entering the property on the First Church lot and appropriating it to the use of the consolidated churches. Further facts and the questions raised will appear in the opinion.

Two propositions are before the court for determination.

First: May this action, under the facts as they appear from the evidence, be maintained in the name of the plaintiff?

Second: Is there an interference by the new United Church with the property rights of the First Church resulting in the unlawful appropriation of the latter's property without its consent?

Looking, then, to the first proposition:

The issue raised by the first defense is that this action was brought in the name of the First United Presbyterian Church without authority from said organization or the trustees thereof, and that said church did not bring this action and is not the plaintiff.

In determining this question two statutes are necessarily involved and must be considered in connection with the evidence.

"Section 8654 (G. C. )—*Members of a Religious, Secret or Benevolent Society*. Where the incorporators of such a corporation now or hereafter formed, are or become members of a church, religious, secret or benevolent society, and have signed or sign articles to incorporate either thereof, any person who is or becomes a member of such church, religious, secret or benevolent society, in good standing, thereby shall be a member of such corporation, with the right to vote at all of its meetings for the election of officers or for any other purpose."

Section 8660 provides:

"The corporate powers, business and property of corporations formed under this title shall be exercised, conducted and con-

trolled by the board of directors; or, if there is no capital stock, by the board of trustees.''

It is not claimed by plaintiff that this action was brought by the trustees of the First U. P. Church. The evidence shows that some two or three meetings were called by a few of the protestants and that no regular notice of a meeting of the trustees was given. The testimony on this point is clear and uncontradictory. There were seven trustees of this church acting at the time the proposed union was commenced, to-wit, John L. Noble, Clark Best, Mr. McCutcheon, Robert Speer, Seth Campbell, Elliott Ralston, and James A. Young. The last three favored the union of the two churches. We will notice briefly the testimony of the two men who verified the petition, Mr. John L. Noble and S. I. Duff, who were trustee and elder, respectively, of the First Church.
Mr. Noble was called:

Q. Did any notice of the trustees meeting go out? Did you have any?
A. No, sir.
Q. It was, in fact, simply a little meeting of the individuals who were opposed to this church union, wasn't it, Mr. Noble?
A. Yes, the way it was carried out.
Q. And that was your sole authority for the bringing of this action, wasn't it, Mr. Noble?
A. That was — Yes, sir, it was.
Q. Did you ask any other trustee to join you in this lawsuit?
A. We just talked the matter over, as I stated a while ago— during meetings and as I stated here before, I was appointed one of the committee, not acting really as a trustee at all—as a committee.
Q. Did you ever ask him (Clark Best) to join you in this suit?
A. No, sir.
By the Court:
Q. When was your first meeting held with relation to this matter?
A. That was in April, I suppose, and we had two, may be three.
Q. That many meetings?
A. Yes. Now, they wasn't called meetings of the trustees; just a joint or a general meeting of us, you know, that call our-

selves still the First U. P.'s. We gathered together and talked the matter over and of course we had our chairman and we had our secretary, and then when it come to appointing a committee —a motion to that effect that the chairman would name a committee of two.

Q. - For what purpose?

A. To go and consult the lawyer and if he gave us good advice, recommended us to go ahead, to proceed, gave us the power to proceed; not as trustees but as a committee.

Q. How many of them (trustees) were present at that first meeting? You, yourself, were one?

A. Yes, and Robert Spere, and I think Clark Best. It was probably a week till we held another meeting.

Q. Was it a called meeting for the trustees?

A. No; just kind of a congregation of us, you know, members, what we considered our members took the same action in it as I did myself.

Q. Was there a memorandum made of the action of the trustees?

A. Of the trustees alone, no.

Q. Then none of the meetings prior to the time of the bringing of this action was called as trustees' meetings?

A. No; they were not called as trustees' meetings at all.

Q. Some three of the original trustees had become members of the United Church. They were not notified of the meeting?

A. No, sir.

Q. You treated them as no longer members of the First Presbyterian Church?

A. Yes, sir.

Q. When you brought this action, did you bring it as trustees of the First Church or simply as a committee authorized or as members of the organization?

A. Why, it would be a committee authorized by the members of the organization.

Q. And not by the trustees?

A. No; not by the trustees; just by the members that were present.

Q. Before that, you had no trustees' meetings nor organization of trustees?

A. No, sir.

Mr. Noble further testified that there were from 18 to 25 members present when this committee was appointed; that the

meetings were held at his mill; that a few were there, protestants from the other church, and at one of the meetings John McCall, a member of the Second Church, acted as chairman.

Mr. S. I. Duff testified that he signed the petition:

Q. You did not pretend to be acting for the trustees of the First United Presbyterian Church at the time you signed that, did you?
A. No, sir. I wasn't a trustee.

Mr. Ralston, Mr. Campbell and Mr .Young, trustees who favored the union, all testified that there was no trustee meeting and that they knew nothing of a meeting.

Now it is claimed by counsel for plaintiff that if the trustees did not authorize the bringing of this action, they afterward assented to and ratified it; but I have gone through this testimony and fail to find anything to warrant such a conclusion. Neither of the members of the committee, Mr. Noble and Mr. Duff, claims that they brought this action under authority of the trustees, but simply as representatives of a few dissenting members (18 to 25) who got together at Mr. Noble's mill and decided to take this action.

Surely, if Section 8660 means anything, this suit would have to be brought by the trustees of the First United Presbyterian Church. But it is claimed that the case of the *South Kenton Sunday School Association* v. *Espy et al,* 17 O. C. C., 524, authorized the bringing of this action in this form.

That case may be distinguished from this in this respect: In that case, five of the seven trustees had already executed a deed conveying the property of plaintiff to the M. E. Church. The court say (p. 530):

"Another point made by defendants is that the plaintiff was not authorized to bring this action and that no one has been authorized to sue for it. This claim grows out of the fact that five trustees refused to have the suit brought, and after it had been commenced, signed a document asking its dismissal."

In the case at bar, two-thirds of the members of the First Church had voted in favor of the union, three of the seven trustees included. Four, or a majority of the members either remained inactive or were opposed to the union and nothing appears from the testimony but what they were in touch with the interests of the church.

Yet neither they nor the three who were favorable to the union were ever called upon by the protesting members to defend the interests of the First Church if they were being jeopardized, and, as appears from the testimony, no meeting of the trustees was ever called—no attempt whatever was made to have those officers of this incorporated body act, in whom "the corporate powers, business and property  *  *  *  shall be exercised, conducted and controlled."

In the Espy case only two of the seven trustees remained. They had no quorum to enable them to transact business or fill vacancies in office. In the case at bar, a quorum could have been called, vacancies, if any had occurred, filled, and in either event this suit authorized, if favored. Nothing of the kind was attempted. It seems to the court that at least an effort should have been made to have the legally constituted body, the trustees, act in the matter. Upon their refusal, I have no doubt but that any member in good standing could have brought the suit—not in the name of the corporation, but in behalf of all who felt aggrieved, when the reasons for so bringing the action were made to appear by the allegations of the petition. *Munsel* v. *Boyd,* 10 C.C.(N.S.) 121. Again, in the Espy case, there was no authority to convey procured from members of corporation or from the court (1st Syl.),

Notwithstanding the above distinction between the Espy case and this, and with all due respect for the able court that decided the Espy case, and with a thorough understanding of the facts as therein stated, I am still at a loss to know how its position can be maintained, for as this court views it, it virtually overrides Section 8660 of the General Code. If two trustees could maintain this action in the name of the corporation, then,

by the same process of reasoning, one trustee could maintain it. To hold that one or two trustees or any number fewer than a majority can assume the duties and responsibilities of a corporate body and transact business for and in the name of the corporation, and taking refuge beneath the corporate name, engage in a lawsuit and thus compel it, without its consent, to submit to costly litigation, as in the case at bar, seems to this court to be beyond reason or authority.

"A meeting of the church members as such as not a meeting of the incorporated society, and it can not instruct the trustees in their duties, or assume any power over them."   24 Am. & Eng. Encyc. Law, 360 (2d Ed.)

So far as I am able to ascertain, the same principles apply alike to religious corporations and corporations for profit.   The same section of the statutes that fixes the duties and obligations of the officers of the one imposes like duties and responsibilities on the other.   And even a *majority* of such trustees may not bind the corporation acting separately, and not collectively, as a board. A well considered case on this subject may be found in 5 N. P. Rep., 378, where these principles are discussed and some of the authorities collated by Judge Dellenbaugh, of the Cuyahoga common pleas.

"A religious corporation can only be bound by its board of trustees acting as a body; and a contract made by the members of the board of trustees, constituting a majority of the board, but acting separately and not collectively as a board at a meeting regularly called, will not bind the corporation, but such members will be individually liable." *Lumber Co.* v. *Taylor St. M. E. Church,* 5 N. P., 378.

"The fact alleged in the answer, to-wit, that the plaintiffs were not trustees of the corporation, *goes directly to the plaintiffs' legal capacity to sue* in this case; the defendants had the right, as we think * * * to make this issue by answer," etc. *First Pres. Society* v. *Smithers,* 12 O. S., 248, 252.

"The same general rules apply to actions by religious societies, whether incorporated or not, as apply to civil corporations, or associations."   24 A. & E. Encyc. of Law, 371 (2d Ed.)

In view of these authorities, supported by plain principles of reason and justice, this court must and does hold that this action can be maintained in the corporate name of the First United Presbyterian Church of New Concord, Ohio, by that body only whom the statute designates as the custodian of its powers, business and property, to-wit, its board of trustees.

While the view taken by this court of the right of these persons to maintain this action in the name of plaintiff is decisive, inasmuch as the evidence on the question as to the legality of the proceedings for the union of the two churches has been submitted, I will take up a consideration of that branch of the case, assuming that the First Church *is* in court.

The evidence discloses the following facts:

On April 1, 1854, a conveyance was made by Jas. Findley and wife, of the first part, to Henry J. Bonner, Andrew Walker and James D. Dunningham, of Muskingum county, and Francis Discon, of Guernsey county, constituted as a building committee, party of the second part, for the real estate in question, situate in New Concord, Muskingum county, Ohio.

The recitals in the deed are, "that the said first party, for and in consideration of the sum of two hundred dollars to them secured to be paid by the party of the second part, have given, granted, bargained and sold, and by these presents do give, grant, bargain, sell, release, convey and confirm unto the said party of the second part their successors or legal representatives therefor in trust for the congregation for the purposes of erecting thereon an Associate Reformed Meeting House" * * * "to have and to hold the same, as aforesaid, with all the privileges thereunto belonging, unto them, the said party of the second part, for the purpose as aforesaid."

No other or further conveyance has ever been made. From the testimony of Dr. John S. Speer, we learn that this congregation was organized about the year 1812 and church and cemetery founded at a point perhaps a half mile outside the corporate limits to the south of New Concord, known as Crooked Creek; that this congregation worshiped there until the year 1854, when the

above conveyance was made and the present church building was erected thereon. It was still known as the Associate Reformed Church and remained so until the year 1858, when a union was perfected between the Associate Reformed Church and the "Associated" churches, under the name of the United Presbyterian Church of North America; and this church was then called the First United Presbyterian Church of New Concord.

From the time of the union above mentioned until the present, this church became tributary to, part and parcel, and under the jurisdiction of, the United Presbyterian Church of North America.

On the 9th of July, 1896, articles of incorporation were issued by the Secretary of State in behalf of the First Church, to Alex McConaughy, Thomas J. Dickson, M. M. P. McCreary, M. E. Trace and C. P. Given. The third article provides:

"The purpose for which said corporation is formed is to organize and maintain an organization or association of persons for the purpose of worshiping God according to the tenets and belief of the U. P. Church of North America, and in accordance with the discipline of said church and to hold property for church purposes, and for all purposes for which similar bodies are organized."

The complaint made by plaintiff is that the defendants and all who are associated with the "United Presbyterian Church of New Concord (the new or united organization) deprive plaintiff of its access to and use of the church; that plaintiff is an incorporated body and as such holds the title and is entitled to the possession of that property without interruption or molestation on the part of anyone who is not a member of the incorporated body; that those who favor the union of these two churches are not members of it."

"That Section 10008, G. C., points the way and the only way in which unincorporated religious societies or ecclesiastical bodies may consolidate."

On the other hand, defendants claim that this statute is not exclusive, but cumulative, in connection with common law rights.

One may see at a glance that the legislation on the subject of conveying or encumbering property belonging to such organizations and the consolidation of these bodies has been done piece-meal, covering quite a space of years.

A half dozen years before the above statute was enacted (1870), our General Assembly passed a law defining the method by which two or more religious societies, churches or associations *recognizing the same ecclesiastical jurisdiction, form of faith, government, order and discipline* may be consolidated and *a new corporation formed*. This statute is now Section 10004 of the General Code of Ohio.

Upon comparison of these two laws, one distinction is quite patent and that is, consolidation under General Code 10004 must be confined to those "religious societies, churches, or associations *recognizing the same ecclesiastical jurisdiction, form of faith, government, order and discipline* only. While consolidation under Section 10008 is much broader in its scope and, apparently, is intended to protect the new organization and every person interested in the property rights of both the separate and the united bodies. It applies as well to *incorporated* as to *unincorporated* bodies, and their religious beliefs, ecclesiastical jurisdictions, faith, form of government, and discipline may be entirely at variance with one another. Again, Section 10004 provides a way by which the consolidated body may become endowed with full corporate powers, without requiring it to take up the usual formalities incident to the incorporation of an original association. Nothing of this kind is provided for in Section 10008.

It (10008), does not take the initiative by providing *how* these bodies may unite; much less how organizations of the faith, form of government, and discipline and under the same ecclesiastical jurisdiction may be unified.

It simply says that courts will assume jurisdiction and order the conveyance .of real estate when certain facts are made to appear as follows:

First, The union must have had the support of every member of the separate organizations.

Second, the proper officers of the new society may, at the request of the majority of the members of either of the societies, denominations, or corporations, petition the court of common pleas for an order to convey the real estate belonging to the separate organizations to the consolidated body.

Third, the order shall not be inconsistent with the original terms upon which the real estate became vested or intrusted to the parties to the union.

Fourth, the grantors of the real estate or their heirs shall be made parties.

Fifth, notice of the pendency of the petition shall be published for four consecutive weeks.

Thus, this statute opens the way for the consolidation of any and all kinds of separate religious bodies by fully protecting the rights of all who could possibly be interested.

Upon an examination of the legislation, we find that Section 10008 is the only one that has any application to the present case. It is absolutely silent as to the personal property belonging to the consolidated bodies. Was there, or is there, then, any common law remedy or proceeding?

The first maxim in equity jurisprudence is that "There is no right without a remedy."

I believe I am correct in saying that the whole of the legislation by way of general laws on the subject, in Ohio, has been since 1864.

If plaintiff's contention is correct, we must assume then that for the first sixty years of our existence, we had no law applicable to the subject and that there is yet no law by which personal property may pass to the consolidated body.

That is hardly likely. In fact, our courts on several reported occasions, have recognized the common law rule, or equitable principle. In the case of *Price v. M. E. Church,* 4 Ohio, 515, decided in 1831, we find the following as syllabus:

"5.  The right to pews in a church, it seems, is limited and usufructuary and does not interfere with the right to pull down and rebuild the church, and if one, not a member of the society, purchases a pew and occupies it for thirty years, he still has but a qualified property in it, subject to the common control."

"6.  The property of a religious society is subject to the control of a majority of its members.  But in such case the majority must act in good faith and not wantonly."

Judge Wright, in delivering the opinion for the Supreme Court, says:

"Property of this kind, acquired by the common contribution of the members of an association, is subject to their common control.  No separate interest is acquired and such property is managed by the majority.  Even a vote to divide gives to individuals no right to enforce any separate interest.  *Denton* v. *Jackson*, 2 Johns. Ch., 329."

Then again in 1834, we have the case of *Keyser et al* v. *Stansifer et al*, 6 Ohio, 363.  Section 1 of the syllabus is as follows:

"Where a religious society purchases land, the title vests in them in fee as a corporation, and the majority of the society, if the charter does not otherwise provide, has the right to control its use and occupation at their pleasure, and no supposed error of opinion or doctrine will authorize the interference of a court of equity to deprive them of such rights."

The same principle is again announced in *Wiswell* v. *First Congregational Church*, 14 O. S., 31, at page 43:

"That the corporation, with the consent and approval of a majority of the members, may sell the property, is not doubted.  This is incident to every corporation, unless *expressly restrained,* and by this charter is clearly and distinctly allowed."

See, also, *Brundage* v. *Deardorf*, 92 Fed., 214.

How then shall we construe General Code 10008?  Is it an innovation by the General Assembly on a totally unexplored

field, or is it rather a creature arising from the exigencies of an occasion when its necessity became apparent to the legislative mind, to meet the requirements of extreme cases?

"No statute enters a field which was before entirely unoccupied. It either affirms, modifies or repeals some portion of the previously existing law.  *  *  *  Whether the statute affirms the rule of the common law on the same point or whether it supplements it, supersedes it, or displaces it, the legislative enactment must be construed with reference to the common law; for in this way alone is it possible to reach a just appreciation of its purpose and effect. Again, the common law must be allowed to stand unaltered as far as is consistent with a reasonable interpretation of the new law. The general rule in the exposition of all acts of parliament is this, that in all doubtful matters, and where the expression is in general terms, they are to receive such a construction as may be agreeable to the rules of the common law in cases of that nature; for statutes are not presumed to make any alteration in the common law further or otherwise than the act does expressly declare; and therefore, in all general matters the law presumes the act did not intend to make any alteration, for, if the parliament had had that design, they would have expressed it in the act." Black on Interpretation of Laws, Section 95, p. 233.

Applying these principles to the above statute, it is apparent that Section 10008 was never intended to supersede the common law remedy and that decisions above cited correctly lay down the law of today.

Of course no one would contend that a corporation would have the right at any time to divert the property from the object and purpose of the grant or donation.

But that is not this case. Here the plaintiff, a corporation by a vote of more than two-thirds of its members present at the meeting, took the initiative and voted to consolidate. That each of the members of the First U. P. Church had the right to vote on this proposition, I have no question.

Section 15 of the Book of Government and Worship provides:

"All who profess faith in Christ and obedience to His laws

and ordinances are members of the visible church, and are entitled to *all its rights and privileges.*"

Then Section 6854, General Code, provides that after a religious society has become incorporated, any person who is, or who becomes, a member of that church or society shall be a member of the corporation with the right to vote at all of its meetings for the election of officers or *for any other purpose.*

Neither do I find any inhibition either in the rules of the government of the church or in the statutes against the right of the members to vote on this subject by proxy.

The plaintiff, by a vote of its members (173 for and 81 against) thus decided upon consolidation.

Then what was the next step? A proportionate number of the Second Church also agreed to the union, on condition that a basis of union could be agreed upon. A committee from both churches reported a basis of union. This basis of union was considered and adopted by each congregation. By Section 3, the name of the United Church is provided for, to-wit, "The United Presbyterian Church of New Concord." Section 5 provides "That all property, real and personal, of the two churches shall become the property of the new church." Section 6, "That a church building, having capacity, convenience, and equipment for the use and growth of the new organization, shall be erected as soon as conditions will admit." Section 7, "That the new building shall be erected on the First Church lot."

All these matters involving property rights that are now complained of by plaintiff were taken up, considered, and favorably acted upon by its members. The records of the Second Church show that each section was considered separately and adopted unanimously.

And then *by a unanimous vote* of the congregation, they adopted a resolution to the effect that their session be instructed to join the session of the First Church in a petition to the Presbytery for the union of the two churches.

Then the sessions of the two churches joined in a petition to the Presbytery, asking that the churches be united on the basis as reported.

The Presbytery approved the movement and appointed a commission of five members of its body "to consider and determine proper action to carry out the plan of the union."

This commission met April 3, 1918, at Cambridge and their time was taken up in hearing protests against the union. They adjourned and met again April 6, at New Concord, where both sides were heard and considered. A third meeting was held at Mt. Perry, April 9, when the commission made its report to the Presbytery, uniting the two churches, "upon the suggested basis submitted by said congregations."

This action was "examined and approved by Synod at Erskine, Michigan, September 25, 1918."

This briefly is the history of this case.

Complaint was made that some eight or ten members from these two churches all of whom were favorable to the union sat as members of the Presbytery when the complaints were heard by that body. But there is nothing in the record to show that the commission appointed to act on this matter was packed or prejudiced in any way and of its eight members not one of the number was connected with either of the two churches and none, dissented from the report in favor of the union.

This report briefly reviews the condition of the churches, their immediate needs by way of accommodations for the membership, and concludes with the resolution that they "be and are hereby united as one church and congregation * * * said union to be upon the suggested basis submitted by said congregations."

I can not see where there was any manifest abuse of power exercised by either the Presbytery or the Commission. No obligation was imposed by either that had not already been assumed by the two congregations before the matter of union ever reached the Presbytery. No property rights of either were invaded. All these matters were acted upon and determined by

the congregations before the Presbytery had assumed jurisdiction, and the action of the latter body amounted to nothing more nor less than simply a confirmation and ratification of plaintiff's own acts. Whether or not this court has jurisdiction in this matter until plaintiff has first exhausted its remedy in the church judicatories, I find that none of the charges enumerated in the protest which was lodged with the Presbytery, vital to the issues, has been sustained by the evidence.

In the face of the above facts and authorities, should the plaintiff be heard to complain?

If the rule is correctly stated in *Price* v. *Church, supra,* ''That the property of a religious society is subject to the control of a majority of its members''; if the principle announced in *Keyser* v. *Stansifer,* that ''Where a religious society purchases land, the title vests in them in fee as a corporation and the majority of the society, if the charter does not otherwise provide, has the right to control its use and occupation at their pleasure,'' approved in *Wiswell* v. *First Congregational Church* above cited, is the law of this state today, as I believe it is, then the plaintiff has made its own bed and must lie in it; and this must be true in the absence of fraud in procuring the union, even though a respectable number of the minority enter a protest.

If the rule were that the decision of the members of the two churches must be unanimous, it would amount practically to a bar against all proposed unions, for, no matter how meritorious the case might be, in every congregation there would probably be found at least one person opposed to the proposition, if for no other reason than that he was constitutionally opposed to that which every other member favored.

''Where public policy or the positive law of the land is not contravened, the decisions and order of such (religious) society, when made in conformity to its policy, should have the same effect in civil courts which the society intended should be awarded to them when pronounced by its own judicatories.'' *Harrison* v. *Hoyle,* 24 O. S., 254.

While testimony is before the court to show that a protest was

made by a minority in the Second Church, before the Session and the Presbytery, that body is not in court and, for all intent and purpose of this suit, is satisfied with the union at this time or at the time this action was brought, and the opposition of such minority to this union, as it there existed, should not be taken into consideration by the court further than is necessary to ascertain the action of that congregation at the time on the question of consolidation.

Even though it be claimed that inasmuch as a two-thirds vote is required for the union of two corporations of like faith and discipline, under 10004, such as we have here, and consequently, that that rule, or at least one equally as decisive, must obtain in order to bind the plaintiff rather than that upheld by the foregoing decisions, yet, should the plaintiff, after having voted for consolidation and having met the requirements of 10004, now be permitted to say in effect, "true, more than two-thirds of our merbership voted for the union, but the other congregation had no right to vote under that law, no matter what other rights to consolidate they may have had; consequently we will take refuge behind their unauthorized act and seek relief from the effect of our own act and conduct even though the congregation at fault is not here complaining? I hardly think so.

Again, should it take a greater number of its members to consolidate with an unincorporated body than is required for voluntary dissolution, where a vote of only a *majority* of the members present is required? General Code 8739.

Counsel for plaintiff place much reliance upon the case of *Presbyterian Society* v. *Markley,* 10 N.P.(N.S.), 529. I regard this opinion by Judge Hoffheimer as a very able exposition of the law on the subject and some of the facts in that case were quite similar to this; but the pivotal facts are different. The whole of Judge Hoffheimer's opinion is evolved from the consideration of a few vital points. There was a written agreement between the First and Second Presbyterian Churches of Cincinnati (both corporations) for consolidation according to the requirements of the Presbyterian form of government *and*

*the statutes of Ohio.*   The court held that by virtue of the stat-
utes such agreement and plan were invalid and inoperative un-
less approved by a two-thirds majority of the members of each
church, as the statutes required.   The Presbyterian form of
government provided that a request for consolidation by the
churches should precede its action in consolidating.   Such re-
quest had not been made.   The Presbytery also undertook to
add a third, the Ceneral Presbyterian Church, to the union,
and "It thus appears as a mater of fact, the agreement to merge
was never consummated because the requirements of the stat-
utes were not met, and it also appears as a fact that the peo-
ple who composed the First Congregation never requested an
ecclesiastical union with the Central and Second Presbyterian
Churches."   (p. 541.)

Judge Hoffheimer asks a very pertinent question in that case:
"How could secular trustees of a corporation created under
the law of a state   *   *   *   be merged out of corporate office
by a purely ecclesiastical decree, or by force of it?"   Under
the facts of that case, the First Church never having made the
necessary "request" for the union and the members of the
First Church never having requested a union with the Central
and Second Churches, that could not be done.   But in the case
at bar, with more than two-thirds of the congregation present at
a meeting regularly called for the purpose, voting in favor of
the union and which must necessarily have meant the final sur-
render of its charter, could not the plaintiff have so decided
even before a formal surrender of the charter to the state had
been made under General Code 8738 *et seq.,* which requires but
a majority of those present at the meeting voting in favor of the
surrender?

As stated earlier in this opinion, the Presbytery has not, by
its decree, robbed plaintiff of any of its corporate rights.

It has not legislated plaintiff's trustees out of office, nor has
it so decreed; neither has it interfered with its property rights.
All these rights were in effect, voluntarily surrendered to the
union by its own deliberate acts.

Those acts do not involve the question of sale or incumbrance of church property which is usually perfected through an order of the common pleas court. Nor is there in the act of consolidation, a diversion of the property from the object and purpose of the original grant; but rather, in furtherance of it.

All the Presbytery did was simply to grant plaintiff's petition along with that of the Second Church, praying for the consolidation of the two bodies.

Having taken these steps, with all the proceedings regular, and with no charge of fraud, the plaintiff should be required to abide the results.

It is exceedingly unfortunate that this litigation has arisen between these two congregations of the same village and of the same faith. No doubt, it has already engendered bitterness among some of the members that will linger in the memories of future generations; and the finger of the scoffer of that locality will point to it as a monument to religious strife, and it is plain that it will not be conducive to the building up of the great cause of the Master.

If there would be anything that could be done to remove this 'eeling consistent with the principles of law and justice, the court would gladly tender its services; but it is feared that the mischief has already been done, and we must rest content with a decision of the questions involved.

The decree will be for the defendants and the temporary restraining order dissolved. Judgment accordingly. Appeal bond, $250.

NOTE: This case was taken on appeal to the Court of Appeals and on April 29, 1919, the following decision and entry were made: ''Judgment for defendants. Petition of plaintiff dismissed and injunction dissolved.''