SHINNECOCK HILLS & PECONIC BAY REALTY CO. v. ALDRICH et al.

(Supreme Court, Appellate Division, Second Department. April 30, 1909.)

1. DEEDS (§ 140*)—CONSTRUCTION—EXCEPTIONS.

If an exception in a deed is susceptible of more than one meaning, it should be construed most favorably to the grantee, and, if it is so vague as to identify nothing, it excepts nothing.

[Ed. Note.—For other cases, see Deeds, Dec. Dig. § 140.*]

2. DEEDS (§ 93*)—CONSTRUCTION—INTENTION—SITUATION OF PARTIES.

Deeds should be construed the same as contracts, in that the court, so far as it can, will put itself in the position of the parties and ascertain their intention from the language, context, and surrounding circumstances.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 231, 232; Dec. Dig. § 93.*]

3. EVIDENCE (§ 536*)—EXPERT TESTIMONY—COMPETENCY.

One who had made a special study of, and had compiled, deciphered and published, ancient town records, was competent to testify as an expert as to allotments made of marsh lands in 1654 and subsequently.

[Ed. Note.—For other cases, see Evidence, Dec. Dig. § 536.*]

4. TRESPASS (§ 46*)—ACTIONS—SUFFICIENCY OF EVIDENCE.

In trespass, where plaintiff claimed through a deed excepting certain lands, evidence *held* to show that the parties to the deed understood that the land claimed by plaintiff was a part of the land theretofore allotted and then owned by others.

[Ed. Note.—For other cases, see Trespass, Dec. Dig. § 46.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

5. ADVERSE POSSESSION (§ 104*)—GRANT—PRESUMPTION.
   A grant is presumed from acts of ownership exercised from the time of the memory of man.
   [Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 595–602; Dec. Dig. § 104.*]

6. DEEDS (§ 140*)—EXCEPTIONS—CONSTRUCTION.
   Where a deed excepted from the land granted all such meadows as had theretofore been allotted to and were then owned by particular individuals, one claiming under the exception must show both an allotment to, and legal ownership by, such individuals.
   [Ed. Note.—For other cases, see Deeds, Dec. Dig. § 140.*]

7. DEEDS (§ 140*)—EXCEPTIONS—CONSTRUCTION—CERTAINTY.
   A description in a deed included the land in controversy, but excepted all marshes and meadows within the boundaries theretofore allotted to, and then owned by individuals, and stated that it was the intention not to convey the meadows or marshes theretofore mentioned. The town records showed an allotment of a division of meadows in 1654, which included the premises in dispute, and subsequent sales thereof by individual owners, and that such owners exercised acts of ownership long enough to create the presumption of a grant, and the parties to the deed understood that the excepted land was a part of the meadows theretofore allotted and owned by individuals. *Held*, in view of the circumstances, that the exception in the deed was not void for indefiniteness, but sufficiently identified the lands excepted, which included those in controversy.
   [Ed. Note.—For other cases, see Deeds, Dec. Dig. § 140.*]

8. ADVERSE POSSESSION (§ 21*) — ACTS OF OWNERSHIP — "CULTIVATE" — "IMPROVED."
   Code Civ. Proc. § 370, provides that for the purpose of constituting adverse possession by one claiming title founded upon a written instrument, etc., land is deemed to have been possessed, where it has been usually cultivated or improved. Defendants and their predecessors had openly and notoriously, for a sufficient length of time to create the presumption of a grant, cut and removed for purposes of husbandry the hay which grew on salt meadow land; that being the only purpose for which the land could be used. *Held*, that as to "cultivate" meant to improve the product of the earth by manual industry, and "improved" land generally meant such as had been reclaimed and was used for husbandry, whether for tillage, meadow, or pasture, the yearly cutting and removal of the grass was such an act of ownership as to constitute a technical adverse possession within the statute.
   [Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 109, 110; Dec. Dig. § 21.*]
   For other definitions, see Words and Phrases, vol. 2, p. 1781; vol. 4, pp. 3450–3451.]

9. ADVERSE POSSESSION (§ 13*)—ACTS OF OWNERSHIP—SUFFICIENCY.
   Acts of ownership exercised for a sufficient length of time to create a presumption of a valid grant constitutes a technical adverse possession.
   [Ed. Note.—For other cases, see Adverse Possession, Dec. Dig. § 13.*]

Appeal from Trial Term, Suffolk County.

Action by the Shinnecock Hills & Peconic Bay Realty Company against Frank E. Aldrich and another. From a judgment for defendants, and an order denying a motion for a new trial, plaintiff appeals. Affirmed.

Argued before HIRSCHBERG, P. J., and GAYNOR, BURR, RICH, and MILLER, JJ.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

J. Edward Swanstrom (Conrad S. Keyes, on the brief), for appellant.

Timothy M. Griffing (Thomas Young, on the brief), for respondents.

MILLER, J. This action was brought to enjoin a trespass, but it was tried upon the stipulation of the parties as an action at law for damages. At the close of the evidence both sides moved for the direction of a verdict, and the defendant's motion was granted. The dispute is over the title of a strip of salt meadow and beach on the southerly side of Cold Spring Harbor in the town of Southampton, Suffolk county. The plaintiff is the owner of the uplands adjoining the strip in dispute. The plaintiff derives title from a deed made March 21, 1861, by the "trustees of the proprietors of the common and undivided lands and marshes or meadows, in the town of Southampton," to Lewis Scott and others. It is conceded that the description in that deed includes the premises in dispute, but the deed contained an exception in the following words:

"And excepting from this conveyance all such meadows and marshes within the aforesaid boundaries as have heretofore been allotted to and are now owned by particular individuals in severalty or otherwise and also further excepting from this conveyance all land covered with water where the tide ebbs and flows within said bounds. It being the intention of this conveyance and it shall be so construed as to convey said track of land subject to all legal highways and roads as aforesaid and in no sense to convey the meadows or marshes heretofore allotted to or the land covered with water where the tide ebbs and flows within said bounds according to the exception hereinbefore contained."

The plaintiff also claims under a quitclaim deed of November 17, 1881, by the "trustees of the proprietors of the undivided lands of the town of Southampton, county of Suffolk, and state of New York," conveying all the right, title, and interest of the grantors to the undivided lands of a described portion of what was known as "The Town Purchase," which refers to an Indian deed made December 13, 1640. The defendants claim that the premises in dispute were a part of what was known as "The Seaponack Division," which was allotted in 1654; and, while they are unable to trace their title to any of the allottees, they show a paper title, to wit, a warranty deed from the heirs of Sylvanus Raynor, deceased, to Franklin Jagger, and the will of the latter devising his residuary estate to them.

The plaintiff claims that the exception in the Scott deed is void for indefiniteness. It is true that an exception in a deed must be taken most favorably to the grantee. Jackson v. Hudson, 3 Johns. 375, 3 Am. Dec. 500; Blackman v. Striker, 142 N. Y. 555, 37 N. E. 484. If the language used is susceptible of more than one meaning, the grantee is entitled to the one most favorable to him; and, if it is so vague as to identify nothing, nothing will be excepted. But deeds have to be construed the same as other contracts. The court, so far as it can, will put itself in the position of the parties and ascertain their intention from the words used, their context, and the surrounding circumstances. Blackman v. Striker, supra; Clark v. Devoe, 124 N. Y. 120, 26 N. E. 275, 21 Am. St. Rep. 652; Thayer v. Finton, 108

N. Y. 394, 15 N. E. 615; Myers v. Bell Telephone Co., 83 App. Div. 623, 82 N. Y. Supp. 83. The contention of the plaintiff is that the exception is as indefinite as though for the phrase, "such meadowlands within the aforesaid boundaries as have heretofore been allotted and are now owned by particular individuals," were substituted the words, "excepting some of the meadowlands within the aforesaid premises"; but those two expressions have only to be put in juxtaposition to perceive the fallacy of that argument. The meadows and marshes, theretofore allotted, so far as anything appearing on the face of the instrument, were capable of being identified; and the question is, What did the parties mean by the expression used? The plaintiff's contention that the exception was merely put in as a saving clause to guard against possibilities is plainly refuted by the instrument. The exception is emphasized by the statement of the intention of the parties; and the expression "excepting as aforesaid" is subsequently used at least four times.

The records of the town of Southampton contain the entry of what a witness who had made a special study of the old records of the town said purported to be an allotment of the "Seaponack Division" made in February, 1654. They also contain entries purporting to have been made during the seventeenth century, subsequent to 1654, of sales and leases by individual owners of salt meadows in the Seaponack division, some of them described as being on Cold Spring Pond. Said witness testified that the Seaponack division included the meadows in dispute, and that there was no other division of the town to which the name could refer. That witness had been one of the trustees of the proprietors and the town clerk of the town for several years succeeding 1860. He had made a special study of, and had compiled, deciphered, and published, the old records of the town. Those records required explanation from one having special knowledge of the subject, and the witness qualified as an expert; indeed, his competence was not questioned. The record evidence then tends to show that there was an allotment of the division of salt meadows, including those in dispute, to individual owners whose ownership continued to be unquestioned after the Andross and Dongan patents. One of the trustees of the proprietors testified that in 1861, consequently about the time of the Scott deed, an arrangement was made between the trustees who owned the uplands and the owners of the meadows, whereby the latter were to have certain rights in the uplands in return for allowing the cattle and sheep pastured upon the hills to go upon the meadows. At that time there was a fence between the uplands and the meadow—how long it had existed did not appear—but there is now a well-defined ditch where it existed. The three other sides of the meadow in dispute are marked by natural boundaries. There is no pretense that the proprietors made any claim to the ownership of this meadow at the time of the Scott deed. On the contrary, the evidence is undisputed that, as far back as any one can remember, the claim of ownership of the defendants and their predecessors has been open, notorious, and unquestioned, and that they or their lessees have annually mowed the meadow and carried away the hay.

There seems to be no room to doubt from the evidence above outlined that the parties to the Scott deed understood that the premises in dispute were a part of the meadows theretofore allotted to and then owned by individuals. However, the language of the exception requires that both allotment to and ownership by individuals be shown. The defendants are unable to trace a paper title to one of the allottees, and, of course, cannot show, what possibly may be presumed, that the allottees took possession. The so-called Farrett patent of 1641 and the Indian deed of 1640 did not convey title; but titles to land in the town of Southampton have their origin in the Andrews patent of 1676 confirmed by the Dongan patent of 1686. Under those grants, the title to the uplands and meadows vested in the corporate body in trust for the original proprietors. Town of Southampton v. Mecox Bay Oyster Co., 116 N. Y. 1, 22 N. E. 387. However, both the Andross and the Dongan patents purport to be confirmatory of existing rights, and the Andross patent contained the recital:

"Whereas there is a certaine Towne in the East Riding of Yorkshire upon Long Island commonly called and knowne by the name of South Hampton," etc.

That charter was evidently granted to secure from the town recognition of the authority of the Duke of York. It appears that an order was made by the general court of assizes under Governor Nicolls in 1670, requiring the towns of Southampton, Southold, and Oyster Bay to give their reasons why they had delayed having their grants or patents renewed or confirmed. The rights of the original settlers were recognized and confirmed by the Andross and Dongan charters, and any divisions of the common lands made prior thereto do not appear therafter to have been questioned. However, in view of the fact that under the Andross and Dongan charters the legal title vested in the body corporate and not in the equitable owners, it would seem that partition could not be made as among tenants in common, but that a transfer by the holder of the legal title was necessary to vest title in the allottees (see Sanger v. Merritt, 120 N. Y. 109, 24 N. E. 386); and it may well be doubted whether land could be transferred by parol after the Andross charter. The English statute of frauds (St. 29 Car. II, c. 3) took effect June 24, 1677, and it seems that there was then in force in the colony of New York a similar statute. The Duke of York's laws, which were said to have been promulgated at Hempstead on March 1, 1665, and copies transmitted to the several ridings constituting the shire of Yorkshire, provided:

"That henceforth no Sale or alienation of Houses and Lands within this Government shall be holden good in Law except the same be done by Deed in writing under hand and Seal and delivered and possession given upon part in the name of the whole by the Seller or his Attorney so authorized under hand and seale, unlesse the said deed be acknowledged and recorded according to law."

See 1 Colonial Laws (Ed. of 1894) pp. 6–30. And that provision was re-enacted by chapter 8 of the Colonial Laws of 1684, Id. 148. It is unnecessary now to determine the effect of those laws, because the evidence showing the acts of ownership exercised as far back as the memory of man runs was sufficient to justify the presumption of

a grant. Roe v. Strong, 119 N. Y. 316, 23 N. E. 743; Id., 137 N. Y. 592, 33 N. E. 743. It follows, therefore, that the learned trial justice was justified in holding that the premises in dispute were excepted from the conveyance of 1861, and that the quitclaim deed of 1880, conveying "undivided lands," was at most only confirmatory of the earlier deed.

Moreover, the defendants' evidence tended to show an adverse possession for 20 years under a claim of title. While there are some cases in the Court of Appeals which seem to be opposed to this view, I think the defendants have made out a case of technical adverse possession under the statute. Wheeler v. Spinola, 54 N. Y. 377, Price v. Brown, 101 N. Y. 669, 5 N. E. 434, and Mission v. Cronin, 143 N. Y. 524, 38 N. E. 964, involved somewhat similar land, but not the same facts, if I rightly understand those cases. The first case involved the annual removal of a load or two of what was called "thatch," the second case involved what was characterized by the court as an occasional "foray for thatch," and in the last case the one claiming title had only surveyed the land, marked boundaries, and from time to time cut trees. In McRoberts v. Bergman, 132 N. Y. 73, 30 N. E. 261, the owner of the upland who had removed sand from the beach and cut grass from the salt meadow was allowed to maintain ejectment on the ground that his right of possession was superior to the defendants'. The evidence in this case shows more than an occasional "foray for thatch." It shows a regular, open, and notorious use of the land, and, in fact, the only use for the purposes of husbandry of which it was susceptible. Section 370 of the Code of Civil Procedure provides:

"For the purpose of constituting an adverse possession, by a person claiming a title, founded upon a written instrument, or a judgment or decree, land is deemed to have been possessed and occupied in either of the following cases: (1) Where it has been usually cultivated or improved. (2) Where it has been protected by a substantial inclosure. (3) Where, although not inclosed, it has been used for the supply of fuel, or of fencing timber, either for the purposes of husbandry, or for the ordinary use of the occupant."

I do not think the words "cultivated or improved" should be used in a technical or narrow sense. The purpose of the statute was doubtless to require that the possession should be visible, open, notorious. There is no doubt that every farmer in the locality of this salt meadow understood who claimed to own it. "To cultivate is defined, 'to improve the product of the earth by manual industry.' When speaking of improved land, it is generally understood to be such as has been reclaimed, is used for the purpose of husbandry, and is cultivated as such, whether the appropriation is for tillage, meadow, or pasture." Clark v. Phelps, 4 Cow. 190–203. That case dealt with another statute, but the quotation is appropriate to this. The land in question is not susceptible of being tilled. Doubtless only the natural grass will grow upon it. Unless annual cutting and carrying away of that grass for purposes of husbandry constitutes cultivation or improvement of the land within the meaning of the Code, it is not possible ever to acquire adverse possession of such land, no matter how notorious the possession in fact may be. The defendants got hay, not

"thatch," from this meadow. They doubtless used that hay for fodder or bedding. Doubtless the annual cutting of the grass improved the crop, at least it made it possible to get a crop, which would be difficult if the grass were not cut regularly. That was the only improvement practicable, at least for agricultural purposes. Had this been an upland meadow, no one would doubt that mowing it annually and taking away the grass were enough to constitute adverse possession. A good farmer might fertilize his meadow lands and regularly break them up; but he would still have adverse possession of them within the meaning of the statute, if he merely cut and carried away the grass. This record suggests, what I understand to be the fact, that the farmers of Long Island regard their salt meadows as more valuable and the use of them more important than was evidently made to appear in some of the cases hereinbefore cited. It appears that the salt meadows were the first lands allotted by the early settlers, and it seems to me that acts of ownership sufficient to give rise to a presumption of a valid grant ought to be sufficient, if under a paper title, to constitute a technical adverse possession.

The judgment should be affirmed.

Judgment and order affirmed, with costs. All concur.