HENRY N. BEERS, Plaintiff, v. HENRY G. HOTCHKISS and Others, Defendants.

Supreme Court, Suffolk County, December 2, 1929.

Lord, Day & Lord [*Lucius H. Beers* and *John R. Vunk* of counsel], for the plaintiff.

Robbins, Wells & Housel [*Percy L. Housel* of counsel], for the defendants.

MILES, Referee. This action in form is one in partition. The premises involved consist of about 500 acres of wild land, unin-closed, uncultivated and unimproved, situated in the town of Southampton, Suffolk county, covered with a growth of scrub oaks and pines common in wild land in that section. The plaintiff alleges that he and the defendant Henry G. Hotchkiss are the owners in fee as tenants in common and in possession of the premises in question, subject only to the inchoate right of dower of the defendant Gladys Hotchkiss, the wife of the defendant Henry G. Hotchkiss.

The plaintiff also alleges, in paragraph " sixth " of his amended complaint, " on information and belief that the defendant, Hilaire E. Campbell, claims to be the owner in fee simple of the premises

hereinbefore described, claiming the title under a deed made to him by the Trustees of the Proprietors of the common and undivided lands of the Town of Southampton, dated the 20th day of June, 1928, and recorded in the office of the Clerk of Suffolk County on the 20th day of June, 1928."

The defendants Campbell do not deny, and, therefore, admit, the allegations of that paragraph of the complaint, and allege " other sources " of their claim of ownership which it is not necessary to particularly state here, the above outline being sufficient to show that the issue thus raised is one of title and that so far as it concerns the plaintiff and the defendant Hotchkiss, on the one hand, and the defendants Campbell, on the other, in reality is one of ejectment. (*Kellum* v. *Corr*, 209 N. Y. 486; *Satterlee* v. *Kobbe*, 173 id. 91.)

The plaintiff and the defendant Hotchkiss base their claim of title upon two sources: *First*, from the town of Southampton by virtue of a deed from " The Trustees of the Proprietors of the Undivided Lands of the Town of Southampton by David R. Rose, their president," to Henry W. Maxwell, dated November 7, 1882, recorded in the Suffolk county clerk's office November 13, 1882, liber 269, page 161, and from said Maxwell by an unbroken chain through various mesne conveyances to the defendant Henry G. Hotchkiss, by deed from Charles H. Shaw and wife, dated May 9, 1928, recorded June 9, 1928, in liber 1353, page 439, and by a deed from the defendant Hotchkiss dated July 30, 1928, recorded August 2, 1928, liber 1365, page 525, conveying the undivided one-third of said premises to the plaintiff, Beers; and, *second*, under a tax deed from John Sherry, county treasurer of the county of Suffolk, to J. B. Sabine, and by various mesne conveyances which plaintiff claims finally vested title in himself and the defendant Hotchkiss.

The defendant Campbell's claim is somewhat unusual, in that the only instrument purporting to convey any interest whatsoever to him is a conveyance from the trustees of the proprietors of the common and undivided lands of the town of Southampton dated June 20, 1928, forty-six years after the same grantors, or their predecessors, had conveyed the same premises to Henry W. Maxwell, from whom the plaintiff traces his title. Neither does the defendant Campbell show or claim any actual possession of any part of the premises whatever until about the middle of March, 1928, three months before the deed last above mentioned, when, according to his own testimony, he settled upon and cleared between twelve and twenty-five acres thereof for the purpose of utilizing it for a flying field.

He also erected a hangar, and on May thirtieth started taking up passengers. Upon what claim of right, if any, the defendant took possession of that portion of land, the evidence does not disclose. The defendant also offered in evidence a contract between one Percy P. Anderson and himself dated October 22, 1928 (over two months after this action had been commenced), whereby the said Anderson was to attempt to convey to him all the right and title of his grandfather and another, and in the meantime it purported to grant possession to defendant. That contract, however, was never consummated, and it expired by its own limitation on December 31, 1928.

There is no question of adverse possession involved in the case. The defendant Campbell's attorney upon the oral argument expressly denied any such claim. In fact, there is no evidence in the whole case of any acts of possession whatsoever by any one except those of the defendant Campbell above referred to, and that contained in the testimony of one Alonzo Vail that " something over forty years ago " he with others, while in the employ of one Samuel Griffing, cut wood upon some part of these premises.

The defendant Campbell's claim to the possession of these premises is based, not upon the strength of his own title, but upon the claim that the plaintiff has none. His first claim is that the deed from the trustees of the proprietors of the undivided lands of the town of Southampton to Henry W. Maxwell, through whom the plaintiff claims (heretofore referred to), passed no title to the land it purported to convey, for the reason that the grantors therein named never had any title to convey. That long prior to the existence of the " Trustees of the Proprietors, etc.," the town of Southampton itself, the owner of all the public lands within its border, by virtue of certain grants from the Crown of England, had, by virtue of the laying out of the Quogue Purchase, the last division (embracing the premises in question) on July 3, 1782, and a division and allotment of the same among the individual proprietors by name on July 4, 1782, parted with the title to the same, and from that time on the various allottees became vested with the title to and entitled to the immediate possession of that portion of the premises that had been allotted them respectively.

His second proposition to defeat the plaintiff's claim is founded upon the provisions of section 335 of the Civil Practice Act, that the premises in question being wild and unoccupied land, and he having shown an unbroken chain of title of one John J. Anderson for over fifty years back, he has established a presumptive title as against the plaintiff, although the defendant, as I have pointed out,

in no way connects himself with that chain except by the contract to purchase heretofore referred to from one Percy P. Anderson, which was never consummated and which expired by its own limitation.

It is upon these two claims that the learned counsel for the defendant Campbell urges in his very able and exhaustive brief that he is entitled to judgment dismissing the plaintiff's complaint.

It is the first of these two claims that to my mind presents the most serious question in this case. What was the legal effect of the allotment of the premises in question in 1782? If that allotment carried the title out of the town effectually so that thereafter it had no title to convey, the learned counsel for plaintiff concedes that plaintiff's predecessor in title, Maxwell, got no title by the conveyance to him by the trustees of the proprietors of the town in 1882 and that he had none to be transmitted to the plaintiff.

This question is of as far-reaching importance as it is serious, and neither my own investigation nor the research of able and painstaking counsel has revealed any authoritative decision of the question. It, therefore, remains for us to consider the respective claims of the parties in view of the undisputed facts, the statutes applicable at the time, and the various decisions of the courts which seem to throw light upon the subject.

We will first direct our attention to plaintiff's primary claim, *i. e.*, that his title traces back to the source of all titles in that community, viz., to the British Crown.

The town of Southampton became a municipal corporation, and the title to all the land within the limits of its boundaries became vested in it as such by virtue of a patent by Governor Andros in 1676.

This patent was followed by another by Governor Dongan in 1686 which in no wise modified the former grant, but merely confirmed the title in the town as a municipal body. (*Trustees, etc., of Town of Southampton* v. *Mecox Bay Oyster Co.*, 116 N. Y. 1; *Trustees of Freeholders and Commonalty of Town of Southampton* v. *Betts*, 163 id. 454; *People ex rel. Howell* v. *Jessup*, 160 id. 249; *Lawrence* v. *Town of Hempstead*, 155 id. 297; *Lowndes* v. *Town of Huntington*, 153 U. S. 1.)

In the year 1818 the Legislature enacted a law, chapter 155 of the Laws of New York of 1818, which authorized the proprietors by a majority vote to elect from their number trustees with such power to manage all the undivided lands of the town as the trustees of the freeholders and commonalty of the town of Southampton " now have," and empowered such trustees to sell, lease or partition the same, but especially reserved to the town trustees the

management of the waters, fishing, seaweed and production of the waters for the benefit of said town as they had power to do before the passage of this act.

No useful purpose would be served by a review at this time of the events which led up to the enactment of that statute. It will suffice to say that whatever doubts may have in the past been entertained concerning its validity those doubts have been set at rest by the Court of Appeals in the cases of *Town of Southampton* v. *Mecox Bay Oyster Co.* and *Trustees of Freeholders & Commonalty of Town of Southampton* v. *Betts*, above referred to.

Since the enactment of that law and in accordance with its provisions, the common upland of the town has been managed, leased and conveyed by trustees elected by the proprietors, while the lands under water have been under control of the trustees of the town.

It follows from the foregoing that if the town of Southampton had not parted with its title to the premises in question by the allotment heretofore referred to in 1782 or otherwise, plaintiff's predecessor in title, Henry W. Maxwell, received a good title by the deed to him from the trustees of the proprietors, etc., of the town of Southampton, dated November 7, 1882, and that title is now vested in the plaintiff and the defendant Henry G. Hotchkiss.

As there is no question about the town's alienation of its title other than by the allotments above referred to, the next question that presents itself for consideration is: What was the legal effect of that allotment? Did it convey title outright to the individual allottees, or was it in the nature of a pre-emptive right only to them to be exercised or not in the future?

The town of Southampton was settled in 1640 by men from Lynn, Mass., who brought with them a grant from James Farret, the agent or deputy of the Earl of Sterling, who claimed ownership under a grant from King Charles I of England. No such patent, however, was ever found. Settlement, however, was effected and extensive tracts of land purchased from the native Indians, and although there was no constitutional authority for so doing, a *de facto* government was established, and from that time until 1664 the people enjoyed no government except that of a pure democracy. They, in common with others, were strangers in a wilderness, surrounded by savages, and their common interests required them to band themselves together and their voice at town meetings took the place of the Parliaments of the Old World across the sea. These men formed themselves into communities or towns, and Southampton was thus formed and was in actual

physical existence long before any patent or charter was granted recognizing them as, or creating them into, a political entity.

The people in these various communities gathered together in town meetings. They voted what should be done and what should not be done, and their word was law, and the decisions of those town meetings were rigidly enforced.

These town meetings constituted all the law-making power until after the Dutch conquest in 1664, when the Duke of York (who had received from his brother, King Charles II, a grant of all the lands hereabouts) promulgated at Hempstead in 1665 what is known as The Duke's Laws. These constituted the first laws of the Colonies established by virtue of regular constituted authority under the Crown of England. (1 Colonial Laws of New York, p. 6.)

In the early days of the settlement of the town of Southampton, the expenses incident thereto, for the purchase of the land and acquiring the patents (which were considerable), were contributed by its more prosperous citizens, but the title to the land, where so acquired, vested in the town in its corporate capacity and not in those individuals whose money had paid for it. These persons were called "proprietors," and as such they had an equitable right in the division of the land in proportion to the amount contributed, which was ever recognized by the town by allotments and division among them of great tracts of the public domain. The extent and manner of the allotments appear in great detail in the many exhibits in evidence and is visualized in a general way by a map (Defendant's Exhibit L) drawn to represent the various divisions of the town's common land made from time to time. These divisions embrace the greater part of all the land within the town and, in point of time, extended over a period of from 1640 until after the Revolutionary War. The allotment and division involved in this case was made in 1782 and is shown on defendant's Exhibit L as "Quogue Purchase-Last Division."

In the early days before the enactment of any statutes requiring a more formal method of conveying the title to land, these allotments were indubitably valid. As early as 1665, however, the necessity for a more formal method of conveyancing of real estate was recognized, and The Duke's Laws, heretofore referred to, enacted in that year, embraced the following provision: "That henceforth no Sale or alienation of Houses and Lands within this Government, shall be holden good in Law except the same be done by Deed in writing under hand and Seal and delivered and possession given upon part in the name of the whole by the Seller or his Attorney so authorized under hand and seale, unless the said Deed be

Acknowledged and Recorded according to Law." (1 Colonial Laws of New York, p. 30.) This law, however, expressly excepted " Land granted or to be granted by the Inhabitants of a Town."

This was the first Statute of Frauds. On January 24, 1677, the English Statute of Frauds was enacted (29 Car. chap. 3) in all essentials similar to the colonial statute on the same subject embraced in the Duke's Laws, but without the provision excepting grants by inhabitants of towns. The applicability of this statute to the Colony of New York has never been judicially determined, although Mr. Justice MILLER, in the case of *Shinnecock Hills & Peconic Bay Realty Co.* v. *Aldrich* (132 App. Div. 118, 123), expresses a doubt as to the validity of any allotment after the passage of that act. I, however, am inclined to the opinion that that statute never had any application on this side of the Atlantic. There was no occasion for its application here. The Duke of York had been granted the territory with full right to promulgate all laws necessary for its government, which privilege he had exercised, and there is nothing that would lead one to think that his acts had been or were disapproved by his sovereign.

Moreover, the similarity of the wording of the English statute and the provisions of the Duke's Laws concerning the same subject is such that one is justified in the belief that the English statesmen adopted so much of the Duke's Laws only as were applicable to England where there were no extensive tracts of common land to be divided by municipalities.

This view to my mind finds support in the report of Governor Dongan on December 26, 1686, to the privy council on the state of the province where he wrote, in answer to an inquiry theretofore addressed to him, " The Laws in force are ye Laws called his Royal Highnesses Laws and the Acts of the General Assembly, the most of which I presume Y$^r$ Lo$^{ds}$ have seen & the rest I now send over by Mr. Sprag to whom I refer Y$^r$ Lo$^{ds}$ in this point." (3 Doc. Rel. to Col. Hist. of N. Y. 390.)

It is interesting to note that at this time the Duke of York had become King James II.

In the decade that followed great changes were to take place. England was to experience a revolution, and the Colony of New York was to mark the birth of a General Assembly.

On September 30, 1682, Thomas Dongan was appointed Governor of New York. (3 Doc. Rel. to Col. Hist. of N. Y. 328.) On the day that he received his commission, he also received written instructions authorizing and directing him to convene a " General Assembly of all the Freeholders " with power to pass laws for the government of the Colony subject to the Governor's approval with

the right of veto reserved to the Duke, but a law approved by the Governor was to be valid until so vetoed. (3 Doc. Rel. to Col. Hist. of N. Y. 331.)

The General Assembly met for its first session on October 17, 1683 (1 Colonial Laws of New York, p. 111), and on October 23, 1684, at its second session, a law was passed with the approval of the Governor and not vetoed by the Duke, entitled " Bill to prevent deceit & Forgery," containing the following provision, viz.: " Be it Enacted by this Generall Assembly and by the authority of the same that no bargain sale Mortgage or grant of any house or Land within this Province shall be holden good in Law Except ye same be done by Deed in writting under ye hand and Seale of the Grantor & delivery and possession given in part in the name of the whole by the said Grantor or his attorney so authorized under hand and seale and unless ye said Deeds be acknowledged by the said Grantor before one of the Judges of Oyer and Terminer and Generall Goale Delivery within one yeare after sealing thereof and Recorded as is prescribed in an Act Intitled, An Act to prevent Ffrauds in conveyencing of Lands made this present session of Assembly. * * * Provided Also that this said Act nor any Clause therein Contained shall Extend to houses or Lands given by Will or Testament any thing to the Contrary hereof notwithstanding." (1 Colonial Laws of New York, p. 148.)

After the enactment of this law, the people of New York declared their independence, and in 1777 adopted the first Constitution of this State, and by section 35 thereof ordained " that such parts of the common law of England, and the statute law of England and Great Britain, and of the acts of the legislature of the colony of New York, as together did form the law of the said colony on the 19th day of April, in the year of our Lord one thousand seven hundred and seventy-five, shall be and continue the law of this state."

The learned counsel for the defendant claims, however, that all of the foregoing enactments so far as towns were concerned were rendered nugatory by a statute passed by the Colonial Legislature November 11, 1726 (2 Colonial Laws of New York, p. 329), which expressly purported to validate all allotments and divisions theretofore made at town meetings, and to legalize that practice in the future. It would appear that that law never became effective in consequence of its disapproval by the King. The report of the act in the Colonial Laws of New York is preceded by a statement that " Livingston & Smith and Van Schaack state that this act was repealed by the king February 15th, 1728." This statement the

learned counsel for defendant says represents only the conclusion of the editor.

Livingston & Smith and Van Schaack were official publishers of the laws of the colonies by authority of acts of the Colonial Assembly, and at this late date, in the absence of any evidence to the contrary, their statements must be accepted as correct. The act was never approved by the King, and the fact that it was held for a while before it was formally rejected is not important.

Such being the case, it was not one of the laws in force at the time of the adoption of the New York Constitution in 1777, and, therefore, not in force in 1782, the time the allotment under consideration was made.

In 1782 when the allotment under consideration was made, the laws of the State of New York on that subject were the English Statute of Frauds of 1677 (if it ever applied to the Province of New York) and the act of the Colonial Assembly of 1684, and these acts were not repealed until 1828. And there being no pretense of a claim that such allotment was consummated by any deed in writing as required by those statutes, it was wholly ineffectual to pass any title to the allottees and the title so far as the allotment was concerned remained in the town of Southampton as if it had never been made.

The foregoing conclusion is not in conflict with the decision of the Court of Appeals in *Lawrence* v. *Town of Hempstead* (155 N. Y. 297). The question before the court in that case was concerning the validity of a division of common lands by an "Allotment" and "Fencing order" made at a town meeting. The fencing order involved was made in 1659 and the allotment in 1678, both prior to the enactment of the Statute of Frauds by the Colonial Assembly in 1684; and the fencing order even antedated the English statute of 1677. Nor is it in conflict with the decision in *Denton* v. *Jackson* (2 Johns. Ch. 320).

The decision in *Sanger* v. *Merritt* (120 N. Y. 109; 131 id. 614) holds that an allotment by the trustees of the town of Huntington in 1793 (a record of which was contained in the town records) was not in compliance with the provisions of the statute of this State passed in 1787 (Chap. 44), and, therefore, conveyed no title. A like conclusion would follow had the allotment there in question been made (as was the one in the case at bar) in 1782, for, as has been before observed, the prior colonial statutes had been adopted as valid laws of this State by its first Constitution in 1777. The wording of the Statute of Frauds in 1787 is no more clear and positive than that used in the two former statutes. In fact, it is less so. We, therefore, think the decision in *Sanger* v. *Merritt* may

with reason be considered as an authority for our conclusion in the case at bar.

The case of *Sanford* v. *Lindley*, upon which the learned counsel for the plaintiff lays great stress, was decided by Mr. Justice JAYCOX in 1915 and unanimously affirmed by the Appellate Division (179 App. Div. 940) and permission to go to the Court of Appeals denied by both courts. It is true that in many respects that case is similar to the one at bar. As in this case, also in that, an alleged " Allotment " of common land of a town was under consideration. After a careful examination of the findings in that case, I am left in doubt as to whether the learned justice decided the case in consequence of the illegality of the " allotment " or the insufficiency of the proof, and I cannot regard that case as decisive of the case at bar. Besides, there are other features of that case which clearly distinguish it from the case at bar.

Much was said during the course of this trial and in the briefs of counsel concerning the general practice prevailing in the town of Southampton to lay out lands in the several divisions thereof by the appointment of commissioners to survey them and the drawing of lots by the individual proprietors and the entry of the result of these allotments in the town records. That phase of the case has been carefully considered. Usage continuing over a long period is always entitled to respectful attention. In case of contracts of doubtful meaning, the acts of the parties may be of great help in determining their true construction and in some instances may be controlling.

So in the case of statutes of uncertain or doubtful meaning, the manner in which they had been interpreted and applied during the course of many years might well be considered by the court in their construction.

In the present instance, however, no ambiguity exists and no occasion for construction arises.

The statutes under consideration are as clear as language can make them. No conveyance of land " shall be holden good in law except ye same be done by deed in writing " is the peremptory mandate of the statute.

No custom, however long prevailing, could effect the repeal of a statute or render its provisions nugatory, or excuse any one who disregarded its plain mandates.

In view of our conclusion that the plaintiff and defendant Hotchkiss trace their title directly to its source, we do not see how section 335 of the Civil Practice Act has any bearing upon this case.

The plaintiff having a valid title is in law in the constructive

possession of the premises. (*Thompson* v. *Burhans,* 79 N. Y. 93; *Bliss* v. *Johnson,* 94 id. 235.)

The section above referred to provides that in case of unoccupied lands, the plaintiff may show a chain of title to himself for twenty years, and such proof shall be presumptive evidence of ownership, but such presumption may be rebutted by showing ownership in some person other than the plaintiff.

The defendant Campbell claims to have shown a paper chain of title for fifty years, not in himself, but under instruments bearing on the title of one John J. Anderson, and claims that this meets the requirements of the section in the absence of a superior title.

In this case a superior title is not absent, but is present, in the title of the plaintiff which comes from the original source of all titles.

The plaintiff, having the legal title to the premises in question extending back in an unbroken chain to its original source, could only be divested of that title in three ways, viz.:

1. By showing a valid conveyance to some one else, which the defendant failed to do.

2. By showing adverse possession by some other person for twenty years as required by statute, which he does not claim to have done.

3. By showing such continuous acts of possession as would warrant the court in presuming a grant.

Even this I do not understand the defendant claims to have done. The only act of possession shown, as we have pointed out, is the cutting of wood on one occasion only by one Samuel Griffing over forty years ago, as testified to by the witness Vail. This amounted to nothing more than a mere trespass. (*Mission of Immaculate Virgin* v. *Cronin,* 143 N. Y. 524; *Wiechers* v. *McCormick,* 122 App. Div. 860.)

The only remaining question to be considered is the plaintiff's second ground for his claim of title, viz., that which is based on a tax sale and a deed given by John Sherry as county treasurer thereunder to John B. Sabine, dated December 11, 1901.

If I am correct in the views heretofore expressed, so far as this case is concerned that question is immaterial, but if I am in error, it becomes important, and, therefore, must be passed upon.

I am inclined to the opinion that no part of the premises involved in this suit was embraced in the tax deed from John Sherry, the county treasurer of Suffolk county, to J. B. Sabine. Be that as it may, that question is not of importance if I am correct in the opinion that I entertain that the deed was void. It shows upon its face that the sale was had and the deed given pursuant to the

provisions of chapter 620 of the Laws of 1873 and chapter 80 of the Laws of 1875, which provided for a special method for the sale of land for unpaid taxes in the county of Suffolk.

These laws were not in existence at the time the sale was had. They were repealed by the Tax Law of 1896 (Laws of 1896, chap. 908). (*Peterson* v. *Martino*, 210 N. Y. 412.)

The deed was based upon no law at all, and, therefore, was ineffective to convey title. A law that has been repealed falls within the same category as one that has been declared unconstitutional. (12 C. J. §§ 228, 231.) The so-called curative acts have no application where the instrument is absolutely void. (*People* v. *Ladew*, 189 N. Y. 355; *Ostrander* v. *Reis*, 206 id. 448; *People* v. *Durey*, 126 Misc. 642.)

For the reasons above outlined, I am of the opinion that judgment should be rendered in favor of the plaintiff as prayed for in the complaint, with costs, and findings to that effect will be signed.